Brassey *v.* New York & N. E. R. Co. and others

*(Circuit Court, D. Connecticut.* March 7, 1884.

1. CORPORATION—RECEIVERSHIP—WHEN PROPER.

An insolvent railroad corporation may, in the discretion of the court, upon a bill for an injunction and a receivership, be put in the hands of a receiver whenever the welfare of the various interests clearly requires it, even though no default has actually been made by the corporation in its obligations to the petitioner, but a default is imminent and manifest, and the corporation is in peril of a breaking up and destruction of its business.

2. SAME—COLLUSION, WHEN FRAUDULENT.
    The mere concurrence of the directors, in an attempt to secure the appoint-
    ment of a receiver, does not amount to fraudulent collusion, unless they design
    some injury to the company or its creditors.
3. FINANCES OF THE NEW YORK AND NEW ENGLAND RAILROAD.
    The financial condition of the New York & New England Railroad Company
    reviewed, and *held* to warrant the appointment of a receiver.

Motion of Jonas H. French and others to dissolve order appoint-
ing receiver, etc.

SHIPMAN, J. The petitioners have put their case upon the ground
that neither the allegations of the original bill nor the facts in regard
to the New York & New England Railroad Company existing at the
time of the appointment of the receiver justified the order, but that,
on the contrary, the institution of the suit and the procurement of
the vote of the directors at a special meeting assenting to the pro-
posed appointment were a plan on the part of sundry directors and
the president to injure the corporation, perhaps for selfish purposes.
On the other hand, the corporation and the trustees of the second
mortgage have placed their opposition to the revocation of the order
in part upon the fact that the present acknowledged financial condi-
tion of the corporation demands a receivership, and that the taking
of the road out of the hands of a receiver, in view of the pendency of
three petitions before three legislatures for additional legislative au-
thority to raise money, (the petitions being based upon the financial
necessities of the corporation,) would put the corporation in the midst
of perplexities and dangers from which it is now relieved, and would
imperil the success of any attempt to place the corporation in a con-
dition of solvency.

It is of course apparent that, in their opposition to a revocation of
the order, the trustees of the second-mortgage bonds and the corpo-
ration have a great leverage, from the fact that the business commu-
nity, the shippers of freight, and the creditors of the corporation are
now perfectly aware that the company has not been able to pay its
debts, has lived by borrowing and by the grace of a portion of its
creditors, and from a natural fear of the danger which might result
from putting the corporation back into a condition where it might
not be able either to serve the public or to help itself. The posi-
tion which the commonwealth of Massachusetts, by virtue of its
ownership of about seventeen twenty-eighths of the whole number of
outstanding second-mortgage bonds, has taken in regard to the re-
ceivership, is also, in this part of the case, entitled to much respect.
But it is not my purpose to dispose of this motion upon such consid-
erations. The petitioners have given voice to their suspicions, not to
say their accusations, that this receivership was the result of a plan
to injure either the corporation or the holders of its securities, and
that the suit was collusive between the parties, in the sense of a fraud-
ulent collusion to deceive the court, and thereby to accomplish selfish

and improper purposes. If this is true it is the duty of the court either to set aside the order or to remove the receiver.

I, therefore, propose briefly to examine into the facts, and see whether there was or was not a necessity, arising out of the financial condition and circumstances of the road, for the appointment of a receiver, and to look into the validity of the charges or suspicions of collusive fraud, recognizing the fact that the changed position and relations of the active petitioners in regard to the controlling management of the corporation resulting from the election of directors in the early part of December, might naturally engender suspicions in their minds either of the good faith or of the propriety of the conduct of the new board, although those suspicions might not be well founded. And I re-examine the condition of things on December 31, 1883, with reference to a receivership, with the more willingness because it has been stated here that it was said in another court that probably, if I had known all the facts, the order would not have been granted.

Previous to the annual election of directors of the corporation, Lee, Higginson & Co. gave public notice, by advertisement, that an attempt would be made to elect a new and different board, intimating plainly a dissatisfaction with the policy of the existing management, and solicited the proxies of the stockholders for that purpose. This attempt was openly and plainly proclaimed, and resulted in dropping from the board Gen. Wilson, the former president, and Messrs. Grant and Cannon, who apparently were efficient financial friends of the existing management. Col. French, who was also on friendly terms with these gentleman, was re-elected, and Mr. Kingsbury, a member of the board for many years, was also re-elected. Whether others of the old board were re-elected I do not know.

The report of the retiring president showed that from various causes the road had not, during the year ending September 30, 1883, earned its fixed charges. Promptly, with the announcement of the probable or actual result of the election, Mr. Cannon and the firm of which Mr. Grant is a member demanded and received payment of demand notes against the company amounting to $104,000. I do not speak of this action as unnatural or improper, but simply as one of the financial facts in the case. The retiring directors probably thought it not improper that they should no longer be obliged to address themselves to the work of providing means to sustain the credit and pay the overdue debts of the company.

The new board, as appears both from the official record of their action, and as appeared more in detail upon the original hearing, found themselves compelled to turn early and prompt attention to this subject, and found the company in unexpected straits for money. The pressing debts were apparently larger than they had anticipated. No money was in the treasury to meet the interest on the first-mortgage bonds, maturing on January 1st. There was no money to pay the old debts due to connecting roads. Money could not be spared

to pay maturing notes, except under supposed compulsion. The directors set themselves to the task of borrowing money to meet pressing obligations. It was estimated that some $800,000 were needed, and but about $300,000 could be promised. At this point, in reply to a letter from Mr. Clark, was received a letter from the president of the Erie Railroad Company, in which Mr. Jewett stated that he desired payment of $90,000 of the debt of $190,000 due that company, and that $100,000 might remain for a time. Payment of the January interest could neither be made from the receipts of the New York & New England road, nor could the money be borrowed. A plan was projected and finally carried into effect that the January coupons should be cashed or bought by money furnished by the persons interested in the road, and held until the succeeding July, and that $10,000 should be furnished by the company in consideration of this forbearance and as commission for the services of the bank, which was to receive and disburse the money. Notice to all creditors and the public was thus given of the company's inability either to pay their interest or to borrow the money with which to pay it, and that the company was without either money or adequate credit. For purposes of the present inquiry, an examination of the causes which had brought about this result would neither be gracious nor useful, neither have I sufficient *data* to state them with accuracy.

The fact that the corporation was at a standstill, so far as the payment of its debts and obligations was concerned, existed. The fact that no duty rested upon the directors or upon the stockholders to lend money upon unsecured notes and thus to meet these obligations seems to me to be plain. The directors owed two duties—one to the public, that this road should be kept in running condition so that it could serve the public; the other to the stockholders and to the bondholders, that if possible the property might be kept intact and preserved, so that finally unsecured and secured creditors might be paid and the stock might be saved, and they were called upon to take all proper measures to discharge these two duties. At this time, from the twenty-seventh to the thirty-first of December, the question of temporary relief by a receivership from the peril in which they found the corporation undoubtedly presented itself to the minds of the directors. It would be natural that the idea of protection to the property and benefit to the public through such an instrumentality should have suggested itself. On the thirty-first of December the agent of the syndicate which had agreed to take second-mortgage bonds and thus provide the means for the payment of the expenses of double-tracking the road, the proceeds of the bonds to be used only for work already done, refused to answer the call which was made upon him to take and pay for 170 bonds. I do not propose to consider the propriety or impropriety of the refusal, but, on the contrary, to assume that the agent took the proper course. It is a fact in the case, and a fact which, taken with the occurrences of that day, led the

president to believe that not only no more bonds would be taken, and therefore that the double-tracking of the road must be stopped, but also that Messrs. Cannon, Grant, and French were planning themselves to procure the appointment of a receiver who would act in harmony with them and in hostility to the new policy of the new board, if that policy should prove to be a radical departure from the system of the old board.

In pursuance of authority which had been previously given by the board to call special meetings, the president called a meeting of his board at Hartford on the evening of December 31st, to act upon the question of agreeing or consenting to the appointment of a receiver. Messrs. Clark, Nickerson, Higginson, and French left Boston on the same train, and the silence of the three first-named gentlemen in reply to Col. French's questions in regard to the proposed meeting is seriously criticized. The answer to these criticisims is that they honestly believed that if he was informed of the object before the hour of meeting he would take prompt and effectual measures to communicate with his friends and obtain a hostile receivership in the courts of New York. Their silence and expedition led him to distrust their good faith. This mutual distrust was the cause of the subsequent excitement which attended the issuing of the order. Messrs. French, Cannon, and Grant all deny under oath that the suspicions were well founded or that they had any knowledge of or privity in such a design, and there is no evidence before me which casts doubt upon the truth of the denial. Neither is there any more room for doubt that the other directors really believed that they were only endeavoring to forestall similar action on the part of the gentlemen whom I have named. When the meeting was held a quorum of seven was present and a vote approving of a receivership was carried by a vote of five to two. This action was at a meeting held on January 7th, deliberately approved by a large majority of all the directors. At the hearing on the evening of the first meeting Col. French urgently opposed the granting of the order. The case resolved itself into this: The inability of the corporation to pay its coupons and its other debts was admitted. The expedient which had been adopted for the payment of the coupons was explained. The plan which all parties then agreed was the only feasible plan by which to raise money, was to obtain the requisite permission from the legislatures of Massachusetts, Connecticut, and Rhode Island, and also from the requisite number of the existing second-mortgage bondholders, to issue second-mortgage bonds in payment of the floating debt—a proceeding which would evidently require time and care. Col. French was of the opinion that no danger would arise from attachments, or cessation of business, from connecting roads, or from any other adverse causes, while the applications were pending. The other gentlemen thought that the corporation would be put into great hazard as soon as the knowledge of their actual inability to pay their January interest was known,

and that the announcement of this fact would be a signal for the commencement of hostilities.   Mr. Kingsbury, the trustee of the second mortgage, who resided in Connecticut, and who had long been a director of the road, and had given much time and thought to the affairs of the company, reluctantly assented to the necessity of a receivership.   I believed then, and I still think, that the condition of the corporation was such that there was not only no safety, but that there was absolute and imminent peril to all the interests of stockholders, bondholders, and creditors if a receivership should be refused, and that the welfare of all the various interests required that the corporation should temporarily be placed in a position where hostile arms could not attack it.   The corporation is now enabled actively and efficiently to discharge its obligations to the public from the fact that it is under protection.   Subsequent events simply confirm the conclusion to which I then came.   It could not even now do business, unless it had been permitted to use some of its receipts to pay a part of the outstanding debts due to connecting roads.   The receiver has been seeking from the Connecticut legislature the remission of taxes which are a first. lien upon the Connecticut real estate of the company.   A receivership by some court was inevitable.

The question still remains to be considered, was the institution of this suit, and the efforts on the part of the directors to promote it, an attempted fraud upon any one?   I have carefully listened to the facts and suggestions and inferences which have been stated by the counsel for the petitioners, and I can discover no actual trace of a desire to injure the property or securities, or the honest and true character of the company.   I see circumstances which a mind predisposed to suspicion can easily fasten upon as indicative of a sinister and indirect motive.   The petitioners were carrying a large amount of the second-mortgage bonds, and would naturally distrust action which would depreciate the market value of these securities; but when the circumstances are looked at in the light of other existing facts, the idea of attempted fraud disappears.   I am at a loss to find where the fraud exists when the pecuniary condition of the company is really understood.   If the directors had in mind the wrecking of the road, they could have done it easily by not favoring a receivership.   At the time when the original order was granted, the substantial facts, which have been stated, were apparent, except that I do not now recollect that the refusal of the syndicate to take the bonds, or the payment of the notes to Cannon and Grant & Co., were adverted to, and except that the relations between some of the directors also favored a receivership, and some of the members of the old board were not clearly understood by me.   The facts in regard to the pecuniary condition of the company, and the impossibility of any immediate ability to obtain more money, and thereby gain relief, were clearly perceived.   Upon this hearing the conduct of the receiver, since his appointment, in closing his fast through freight contract

with the New York, Lake Erie & Western Railroad Company, and his printed statements or reports in regard to the financial condition of the company, have been criticised. If the traffic arrangement resulted, through too low rates to the New York & New England road, in constant pecuniary loss to the company, I can see no propriety in continuing the contract, and in continued pecuniary losses. In regard to his financial exhibit, I have heard no adequate reason to doubt its truth, and it was certainly his duty to inform the stockholders and the bondholders of the exact condition of the company.

Were the allegations of the bill sufficient to justify the appointment of a receiver? The petitioner's position is that, ordinarily, to justify such an appointment, a case must be pending in which other and principal relief is sought—as to foreclose a mortgage. It is true that in general a receivership is ancillary or incidental to the main purpose of the bill, but it does not follow that where a case is presented which demands the relief which can be best given by a receivership, such relief must be refused, because the time has not arrived when other substantial relief can be asked. For example, although as a rule, a mortgagee cannot ask for relief until his mortgage debt has become due, he can go into a court of equity before that time has arrived and ask for an injunction and a receiver to prevent the subject-matter of his mortgage from being impaired and wasted. As was said in *Long Dock Co.* v. *Mallery*, 12 N. J. Eq. 431:

"The power of the court to preserve the pledge from destruction, and to answer to the exigency of the mortgage, is undoubted. * * * If the bill shows a case for an injunction and a receiver, the exercise of the power is called for, although the time of payment, set in the mortgage, has not come unless the equity of the bill is met by the answer."

.This bill alleged the existence of the corporation and the first and second mortgage bonds, and of the actual inability of the road to pay its interest, to become due on January 1st; the existence of the floating debt, and its inability to pay that; the intention of some of the creditors to attach the mortgaged property; the peril to the road arising from anticipated attachments of the property covered by the second mortgage; and the loss of and breaking up of the business of the road from its inability to pay connecting lines; and its consequent inability to pay the interest due on February 1st. In brief, it alleged the insolvency of the road, though not in terms, and the danger and hazard of serious injury to the revenues of the company, unless suits were prohibited, and those who did business with it were assured that its current expenses were to be paid. Those allegations were admitted both by the corporation and by the trustees of the second mortgage. I am of the opinion that when a railroad corporation, with its well-known obligations to the public, has become entirely insolvent, and unable to pay its secured debts, unable to pay its floating debt, and unable to pay the sums due its connecting lines, unable to borrow money, and in peril of the breaking up and destruc-

tion of its business, and confesses this inability, although no default has as yet taken place upon the securities owned by the orator, but a default is imminent and manifest, a case has arisen where, upon a bill for an injunction against attacks upon the mortgaged property, and a receivership to protect the property of the corporation against peril, a temporary receiver may properly and wisely be appointed.

It is next said that this was a case of collusion between the orator and the railroad corporation. There is no claim that there was any collusion on the part of the second-mortgage trustees. If by collusion it is meant that the preparation for and institution of the suit were known and desired by the directors, or some of them, in the belief that the granting of the prayer of the bill would be prudent and wise, then there was collusion. If by collusion it is meant that the institution of the suit, or its management, was marked by fraudulent design or purpose, then there was not collusion. The complainant was the actual owner of five mortgage bonds. They were not placed in his hands, and were not transferred to him fictitiously, and were not bought by him for the purpose of this suit. The firm of Lee, Higginson & Co. had the authority to bring suit in his name, or their action has been ratified and approved. The railroad company consented, prior to coming into court, to the appointment, as is frequently and properly the course in cases of this kind. No one attacks the fidelity of the second-mortgage trustees, and they also assented.

In regard to the prayer of the petition for the removal of the receiver, no adequate reason has, in my opinion, been given for such a course. The affidavits of the second-mortgage trustees contain a sufficient reason why such a prayer should be denied.

In regard to the prayer of the petition for the appointment of a co-receiver, I see no reason for antagonistic receivers; and a receiver who should be in accord with Mr. Clark would not, probably, be satisfactory to the petitioners.

The prayer of the petition is denied.