CENTRAL TRUST CO. OF N. Y. and another *v.* WABASH, ST. L. & P. RY. CO. and others.[1]

*(Circuit Court, E. D. Missouri.* December 30, 1886.*)*

1. RAILROAD COMPANIES — RECEIVERS — ORDERS CONCERNING SURRENDER OF PROPERTY EAST OF THE MISSISSIPPI, AND MANAGEMENT OF WHAT IS RETAINED —JURISDICTION—COURT OBLIGATIONS.

The Wabash system of roads was originally placed in the hands of receivers in a suit instituted by the Wabash Company itself. A suit to foreclose a general mortgage on the Wabash property was subsequently instituted, and consolidated with the first suit. The receivers first appointed were retained in possession, and have administered the whole property ever since. They have been appointed by the courts of ancillary administration, as well as by this court. Recently they were removed in the Seventh circuit, and a receiver, appointed by the circuit court of that circuit in a foreclosure suit pending before it, ordered to take possession of the main Wabash lines within the jurisdiction of that court. In the suit instituted here the mortgage has been fore-

closed, and the property sold, but has not yet been delivered. Upon the application of the receivers of this court for instructions, it is ordered (1) that said receivers shall relinquish control of roads east of the Mississippi, of which the receiver appointed by the circuit court of the Seventh circuit shall, under the orders of said court, take possession; (2) that said receivers shall cease the further operation of lines east of the Mississippi, whose earnings have not been in excess of their operating expenses, unless within 30 days some satisfactory guaranty is given that all future deficit arising from such operation shall be promptly paid to them; (3) that they shall deliver to the receiver appointed in the Seventh circuit all books of account which they have in their possession in which the accounts of the roads passed into the hands of said receiver are alone kept, if any there be, but shall retain possession of all general books of account, giving said receiver, however, full facility of inspection and copy; (4) that they shall retain possession of all moneys now in their hands, or which may hereafter be received, from the earnings of roads in their possession, or from the purchasing committee, subject only to the orders of this court; (5) that they shall surrender all rolling stock, if there be any, which is covered by the mortgages in whose foreclosure the new receiver was appointed in the Seventh circuit; (6) that any controversy which may arise between them and the receiver in the Seventh circuit, in determining what property shall be surrendered, shall be reported to this court; (7) that the operation of the lines in the hands of the receivers appointed by this court shall be independent of all other lines; (8) that there will be no dismissal of the case pending in this court as to any parties or interests or causes of action, or any relinquishment of any jurisdiction which is now vested in this court; (9) that the burden of the court obligations. including receivers' certificates, be apportioned to the different branches, and that the master report the earnings and expenses of all lines and branches separately, and the time of their operation by the receivers, up to December 31, 1886.

2. SAME — DELIVERY OF POSSESSION TO PURCHASING COMMITTEE — PAYMENT — BOND.

It is further ordered that the said purchasers of the Wabash property shall pay, within 60 days, into the registry of this court, $1,000,000 in cash or receivers' certificates, and give bond in the sum of $1,000,000 to pay the further awards, and to comply with all further orders of this court, and take possession of the entire property, subject to the right of this court to retake possession on non-compliance with further orders; and also subject to all the terms and provisions of the final decree and the order of confirmation.

In Equity.

Application of the receivers for instructions as to the surrender of certain property to Thomas M. Cooley, who has been appointed Wabash receiver by the circuit court of the Seventh circuit, in the foreclosure suit of *Atkins* v. *Wabash, St. L. & P. Ry. Co.*, 29 Fed. Rep. 161.

*W. H. Blodgett*, for receivers.

BREWER, C. J. During the last two days we have received a petition from the receivers of this court, reporting to us the action that has been taken by the circuit court of the Seventh circuit, and asking instructions from this court as to their action. We have also received an application of the purchasing committee, and the form of an order which they desire.

I may be pardoned if, preliminary to a formal statement of the orders that will be entered, I refer to some matters in the history of this litigation. The Wabash road was a road extending through several states,— states within the jurisdiction of several circuit courts of the United States. There was one general mortgage covering the entire property, and under-lying mortgages upon several local lines which had entered into and be-

come part of.the Wabash system. Proceedings were commenced in this court as a court of primary jurisdiction, and receivers were appointed by this court. Of the propriety of a foreclosure in one court operating upon the entire property running through several states, and of the validity of a sale made in pursuance of that foreclosure, and the completeness of the title which will pass by such sale, there can be now no longer a question. In the case of *Muller* v. *Dows*, 94 U. S. 444, that question was put at rest. In the early history of foreclosure proceedings of this nature it became customary, not merely that foreclosure proceedings should be conducted in the one court, but that, to avoid all questions of title, ancillary proceedings should be conducted in the courts of other circuits; and to conserve the property pending the foreclosure—to guard it against local suits, and preserve it from dismemberment—the custom has also been for the receivers appointed in the court of primary administration to be also appointed in the courts of ancillary administration. That proceeding was had in this case: Messrs. Tutt and Humphreys were two and a half years ago appointed receivers of the entire property by this court as a court of primary administration. Their appointment was confirmed in the several courts exercising ancillary administration, and they have continued in such administration of the entire property up to the present time. So far as concerns the receivers themselves, it is fair to them to say that Mr. Humphreys was named to the court by not only the mortgagor, but by the mortgagees in the general mortgage, and indorsed by a large majority of the trustees in all the mortgages. Doubtless he was suggested to them by reason of his long connection with and knowledge of the affairs of the road, and by his large experience in railroad matters. The other gentleman was named by this court, with the thought that it would be well to have a local receiver sharing in the administration of this property, and in naming him the court selected a citizen of this state distinguished for his business capacity, and for purity of character. Their administration has been so successful that, during the length of two years and a half in which it has been carried on, not only has there been no challenge in the court of primary administration of the propriety of their appointment, but there has not even been a suspicion suggested here of any impropriety of conduct on their part, or of any lack of fitness for the duties intrusted to them.

The records which exist show that in 1883, a year prior to their appointment, the earnings of the road were, per mile, (leaving out the cents,) $4,715; the expenses, $3,826. In the year 1884, the first five months of which the road was operated by the company, and the last seven months by the receivers, the earnings were $4,650, and the expenses $3,895. In the year 1885, of which they had charge during the entire year, the earnings were $4,738; the expenses, $3,995; and in 10 months of this year their earnings have been $5,296 per mile; their expenses, $3,997. When, in addition to that, it is borne in mind, as a fact well known, that the road, prior to their taking possession, was in many places in a very unsafe condition, and that they have expended $445,000 in placing steel rails in the track, $1,303,000 in bridges, and have the

road to-day, in nearly its entire extent, in the best possible condition, I think it safe to say that results attest the wisdom of their appointment, and that such results entitle them to receive, from any unbiased mind, commendation rather than blame.

As appears from the certified copies of orders that have been presented to us, the circuit court of the Seventh circuit district, disregarding the comity which has heretofore existed between the federal courts, has removed these receivers, and appointed a distinguished citizen of the state of Michigan as their successor, for the lines within the jurisdiction of that court,—I say in disregard of the comity which has existed between courts of different circuits; for the pretext of enforcing local liens, said orders are too transparent to deceive any one, and for two reasons: *First*, there will be no line extending through various states without the creation in those states of local liens by mortgage, judgment, or otherwise; and, *secondly*, a foreclosure of those local liens may proceed independent of any receivership. But that court is a court of equal jurisdiction—of equal power and rank with this, and this court disclaims any intention of questioning or reviewing its action. We have no appellate jurisdiction, and the practical question which comes before us is, what action shall be taken by this court upon the basis of the present *status?* As by the act of removing these receivers from the custody and control of certain portions of the Wabash line, some measure of power for protecting the entire property is taken away, the duty of this court is to take special care of the property left in the hands of its receivers, and to see that it is fully protected, and managed for the best interests of all concerned. Full jurisdiction, under the Wabash foreclosure, over the trustees in all the mortgages, having been acquired by this court, the power of foreclosing, as it did, the general mortgage, the power of apportioning the burden of receivers' certificates, and every court indebtedness, among all the varied lines that went into and formed this single system, remains with this court, and, under the circumstances, it is fitting that such apportionment shall be proceeded with at once.

In the final decree which was entered, there was no attempt at any foreclosure of the underlying mortgages. The decree was the common one of a foreclosure of a junior mortgage, and the direction of a sale of the property subject to the burden of the underlying and prior incumbrances. The purchasers, when they purchased, took the property burdened with these underlying mortgages; but did not by that purchase assume the payment of them. The holders of these mortgages had, notwithstanding that purchase, no other security than their mortgages, and the property upon which they were liens. It was provided, however, in the decree, that the purchasers at such sale should take the property subject to the duty of paying off all receivers' certificates, and all debts created by this court. They made their purchase with full notice of these provisions in the decree. They have paid the purchase price. The sale has been confirmed; the deed made. As provided in the decree, the possession has been and is still retained by the receivers, and is to be retained until such time as payment shall be made of these

court obligations, or such security furnished as shall be deemed adequate.

We are well aware that in managing so vast a property, and in the organization of a new corporation of such magnitude as that proposed, some time must be taken; and we are aware of the fact that there has yet been no order entered by this court as to the time within which the purchasers must pay these obligations, and take the property from the hands of the court. We think that time enough has been given for the perfecting of the organization of the new company, and for all other preliminary matters; and that the time has now come when the court should make an order for the payment or security of the debts created in the administration of this estate, and for the taking possession of the property by the purchasing committee.

With these preliminary statements, I proceed to formulate some orders which will be entered. It is expected that counsel will prepare orders that embrace the ideas which will be presented, for I have not had time to draft, in full form, the orders.

In the *first* place, the receivers will relinquish control of all roads east of the Mississippi, of which Receiver Cooley shall, under the orders of the circuit court for the Seventh circuit, take possession. We are advised by the petition of the receivers that there are several minor branches or lines within the limits of that circuit which do not appear within the terms of the order directing Receiver Cooley to take possession. They are lines disconnected from the lines west of the river, whose sole connection, so far as the Wabash system is concerned, is with the lines east of the river, of which Mr. Cooley is ordered to take possession. It further appears from the report of the receivers that every one of those lines, with perhaps one exception, has been operated at a loss during the last two years and a half. It would be folly for these receivers, having no possession of the main line with which those branches are connected, to continue to operate, at a loss, those local lines. So the order will be that they will cease further operation of all the lines east of the Mississippi river whose earnings have not been in excess of their operating expenses, unless within 30 days some satisfactory guaranty is given that all future deficit arising from such operations shall be promptly paid to them.

*Second.* They will deliver to Mr. Receiver Cooley all books of account which they have in their possession, in which the accounts of the roads passed into the hands of Mr. Receiver Cooley are alone kept, if any there be. They will retain, however, possession of all general books of account, giving to Mr. Receiver Cooley full facility of inspection and copy. The intent, of course, is that every facility shall be accorded which is possible to enable him to administer the trust confided to him, successfully.

*Third.* They will retain possession of all moneys now in their hands, or which may hereafter be received from the earnings of roads in their possession, or from the purchasing committee, subject only to the orders of this court.

*Fourth.* They will surrender all rolling stock, if there be any, which is covered by the mortgages in whose foreclosure Mr. Receiver Cooley was appointed. Any controversies which may arise between them and Mr. Receiver Cooley in determining what property shall thus be surrendered, will be reported to this court.

*Fifth.* The operation of the lines in the hands of the receivers will be independent of all other lines. They will make the best traffic and running arrangements with Mr. Receiver Cooley, or with the managers of other railroad lines.

*Sixth.* The officers, and employes under them, will confine themselves to such employment. In other words, if there is to be an independent administration across the river, it will provide the officers and employes to carry on such independent management.

*Seventh.* There will be no dismissal of the case pending in this court as to any parties or interests or causes of action, or any relinquishment of any jurisdiction which is now vested in this court. The burden of the court obligations, including receivers' certificates, will be apportioned to the many different branches; and the master will report the earnings and expenses of all lines and branches separately, and the time of their operation by the receivers, such report to be carried up to December 31, 1886.

*Eighth.* And this refers to the requirements of the court in respect to the purchasing committee. We are not satisfied with the suggestions that they have made to us in their petition or order presented. It appears from the statement that has been furnished to us that there are now due, or will become due by the close of February, about $750,000 of receivers' certificates. Therefore the purchasing committee should be directed to pay, within 60 days, into the registry of this court, $1,000,000 in cash or receivers' certificates, and to give bond in the sum of $1,000,000 to pay the further awards, and to comply with all further orders of this court, and to then take possession of the entire property, subject to the right of this court to retake possession on non-compliance with further orders; and also subject to all the terms and provisions of the final decree and the order of confirmation.

TREAT, J., (*orally.*) In order that this matter may not be misunderstood, for it is important in its vast-reaching consequences, it should be stated that this was not an application by a mortgagee to foreclose. It was an application by the corporation itself, concerning which a great deal of comment has been made elsewhere. The application was originally made to myself, in this circuit, which is limited in extent. I hesitated. I found that Judge SHIPMAN, a very learned and able judge, had gone over *in extenso* that class of thought. After further consideration with respect thereto, I reached the conclusion that his views were correct, to-wit: Here is a vast system, extending through many states and many judicial districts. A default, it was certain, would be made in a few days. What should be done? The interests of all concerned required that some judicial action should be had for the conservation of those inter-

ests,—stockholders, bondholders, creditors at large, etc. And after patient thought, I reached the conclusion that Brother SHIPMAN was right. Since that time, fortunately, the supreme court of the United States has said that it is right. Now, if any one in or out of judicial position chooses to dispute the action of this court, that party may settle that controversy with the supreme court of the United States, which is authoritative, so far as the action of this court is concerned. It was a judicial question.

Now it so happens, as the records of this court show, that in the year 1876,—one of the earliest matters connected with this line of administration,—in the *Case of Ohio & Mississippi Ry. Co.*, extending from Cincinnati into this circuit, parties thereto had suit instituted against it in the circuit court of Indiana. That was the court of primary administration which is within the Seventh circuit. The whole course of that proceeding went forward, not in comity alone, but in the wisdom of administration. Application was made to this court. Application was made to the Southern district of Illinois; and, in the course of the administration, the court of primary jurisdiction had occasion to make changes, by resignation or otherwise, in the receivership of the general system of the line, to which, without exception, this court assented, the court of the Southern district of Illinois assented, and that whole line of administration went forward, as the records of this court show, with the signature of the then judge there, without dispute.

It so happened, I may remark in passing, that, in the absence of my brother judge, I have at every term of this court called upon the counsel —I do not know whether they are now present or not—to know why those accounts are not closed. It seems, from these frequent reports here, for that long series of years those accounts have not been closed. Why? This court might have exacted a final settlement of the accounts of those receivers, the property having long ago been turned over to the parties of record in the United States court of Indiana, retaining them on their liability on their bonds. That delay has existed to this hour. That court has been not quite so exacting as this court is. This case should have been settled, but it is unsettled at this hour. In the course of administration of these matters we have found that not by comity alone, but by the wise administration of the law in regard to these interstate matters, we have proceeded with perfect harmony. At last we encounter a difficulty. How shall it be solved? Without affirming or denying what has been done elsewhere,—without being unjudicial enough to comment upon what has happened elsewhere,—this court yields its administration to no one except an appellate tribunal. Thus standing, being thoroughly satisfied that the original action of this court was correct, not only in taking possession of these vast properties, but also in the appointment of its receivers, I have only this to say: An intimation has been made, which I see before me, that the district judge (myself) refused to pass the original order. It is true in one sense; it is false in another sense. After having satisfied myself that the order was proper, it occurred to me, as the limits of my jurisdiction were only within this

one district, it was wiser and better that the order should come from the circuit judge, whose jurisdiction, so far as these properties are concerned, extended over all the properties west of the Mississippi river. It was not because I thought that the order should not be granted. I fully concurred with what was done. It was a mere suggestion that the order from the circuit judge would be wiser and better, and I so informed my brother judge at the time, and I assume the full measure of responsibility, if there is any, to be attached to it. I hold, however, that the action was right from the beginning to the end, and I stand on that proposition. It was the duty of this court, under the circumstances presented, to take possession of this property, and conserve the interests of all concerned.

It is said, and no one more than the judges of this court can be satisfied that it is true, that there had been an unwise administration of this property. If there had not been, there would have been no need to make an application to this court for the appointment of receivers. But what has this court to do with it? We are not to go back through the past administrations of these properties to ascertain whether, wisely or unwisely, the persons to whom that administration was committed, blundered, or otherwise. The simple proposition submitted to this court was this: Here is a vast property, in a bankrupt condition,—whether through mismanagement or otherwise, was immaterial to this court. Connected with that property were the rights of stockholders and general bondholders, bondholders under underlying mortgages, general creditors, and, further than that, the duties of these corporations to the public at large, and to the state which granted them their franchises.

What is the first inquiry with regard to these matters? The franchise was granted by which the obligations of a common carrier were imposed. All the persons along the line of these various roads, extending through several states, possibly, have contributed their money, in one form or another, for the purpose of having railroad facilities. That matter, to a greater or less extent, has been presented to the consideration of this court heretofore. When franchises of this kind are granted, as was often stated by this court long before my brother judge came upon the bench, to which I suppose he will not dissent, their primary obligation was to the sovereign who granted them the franchise. They undertook, *first*, to pay their dues to the government, in the nature of taxes; *second*, they undertook to run a safe operating road,—safe to life and to the transportation of property. Did they do it? Suppose they cannot do it? Then they fall within the judicial administration to compel them to do the best they can. That is all there is in that branch of the inquiry.

Now, in the course of such administration—it not being new at all, having, so far as my memory serves me as to the course of proceeding, originated in the Indiana district, and been followed up by this court, and by all the other courts,—we have had no difficulty. The court orders that the receivers shall *first* pay the taxes; *second*, make the road

which they are running as receivers safe, and, whatever expenditures are necessary therefor, the court directs them to make, and, if they do not receive funds enough directly for the accomplishment of that purpose, the court will direct them to issue receivers' certificates, which shall be prior in right to all underlying mortgages. And why not? If the parties who have underlying mortgages choose not to come into court, and ask the surrender of their property to the parties interested therein, what shall be done? One of two things is necessary,—the court must either stop running the road, or an expenditure be made for the benefit of all parties in interest, the underlying mortgagees as well as everybody else, in order that it shall be made a going concern. Otherwise, in the expressive language of a distinguished friend, you have nothing but a streak of iron-rust on the prairie. The value of these properties consists in their being in operation. Who shall pay for the operation? Somebody. Now this court has said from the beginning to the end of this matter,—it is nothing new or recent, but as old as the organization of this court, as old as that Indiana case, the *Ohio & Mississippi Case*,—if you desire us to run your property at a dead loss beyond the operating expenses, receivers' certificates have to be issued in order to get the money to do it, and you must take your portion, when the matter is equitably adjusted, of the costs of so doing. So stands the case to-day. Whenever a party has appeared in this court from the beginning to the end of this controversy, objecting that "You don't pay the rental" in some cases, and the interest on underlying mortgages in other cases, the thought with the court has been, what shall be done? If you wish that road to be run, and there are no funds in the hands of the receivers to run it, who shall pay for the running? It must run at your expense. It so happens that, with regard to many of these sectional divisions, there have been surplus earnings above the fixed charges, bearing in mind all the while that this is a general mortgage. What shall be done with them? So long as these underlying mortgages have their interest paid, there being a surplus, no difficulty will arise, and such has been the line of administration by this court. If there be a failure to pay rentals, where it is a rented road, or if there be a failure to pay the interest on underlying mortgages, make your application, and the court will surrender your property to you. No difficulty has occurred in regard to it until recently.

I do not know how many of these cases have occurred. I cannot recall them in my present memory, but a great many have so occurred, and the roads have been surrendered from time to time. I remember the Cairo line. I remember a line over in Indiana; and I remember also, in the wisdom of administration, while the party insisted upon his right as trustee under a mortgage to take possession of a subdivision, and the court granted it, that this court was afflicted a few days afterwards with an application of that trustee, the road having no rolling stock whatsoever,—leaving it a mere piece of old iron on a road-bed,— to permit an order on the receivers to operate it for the benefit of the concern. I hesitated about it. Brother BREWER was not here, but

finally the order was passed, if my memory is correct, to this effect: "This will be permitted, but at your expense."

So, as to the practical operation of these matters, there being no difficulty in theory in my mind with regard to them, we reach the question, "What shall be done?"

Without affirming or denying, as I have heretofore stated, what has occurred elsewhere, as to its legal force or otherwise,—that will remain for other parties to test at a proper time, before an appellate tribunal, if it is so desired,—these orders which I assent to, as suggested by the circuit judge, will be that this court retains its jurisdiction in the manner stated, and what is done with regard to the receivers of this court in turning over to Judge Cooley the matters included within the orders of the circuit court of the Seventh circuit will be so done; but Brother Brewer did not state what is in my mind, and I do not know whether he will concur with me when I state it; I state my individual view.

In taking possession of these lines, which is permissive, nothing else, whereby our receivers may be discharged from obligations hereafter arising with respect thereto, it is only a discharge of our receivers to that extent. These roads will remain, and must remain, subject to all the obligations heretofore created with regard to them. The receiver takes them as they are, as stated by Brother Brewer, as an independent system. If there should be any rolling stock, it belongs to that concern independent of the general system. Under the order, the receivers will turn it over. If there is none, Brother Cooley will have to do the best he can to run his roads.

Now, one word more. Under the maps submitted to this court, it appears there are little fragments of roads left. As I remarked pleasantly, the other day, those fragments begin and end nowhere. They are not included in the terms of the order of the Seventh circuit. What shall be done with them? I presume that they are important for local conveniences of administration. What is to be done with them? They are all behindhand, Brother Brewer says,—all except one. I am not sure about that. I think they are all in that condition. I am speaking of the Illinois roads,—those little fragments presented to us on the map. They have been run at a dead loss. If our receivers retain possession, who is going to pay for the running of them? Where is the money to come from? Unless somebody will guaranty our receivers whereby they may be saved harmless, they must drop the operation of them; and, if the misfortune falls upon the good people in that neighborhood of having no railroad facilities, that will be the result of the order in the Seventh circuit. We have nothing to do with that.

If others choose to break up the line, and deprive people of railroad facilities, the consequence is not with this court. The exception to which reference has been made is this Butler line to Detroit, which, under the terms of the order as presented to the court, still remains in the possession of our receivers. It turns out that that has been operated profitably, and it still remains with our receivers to operate it. It is obvious, however, unless it is operated in connection with the system which

passes to the hands of Judge Cooley, it may be very much damnified, and also that portion of property which Judge Cooley will take possession of will be in a still worse condition. With that outcome in dollars and cents this court has nothing to do at this time.

Now, to summarize. 1. The original application of this case was presented to myself. After full consideration, I had no doubt that it was rightfully presented, and that an order should issue with respect thereto. I affirm, further, that since that time the supreme court of the United States has affirmed that doctrine. Now, if any one chooses to dispute that doctrine, that is a controversy between himself and the supreme court of the United States. We choose to rest on our original judgment, fortified by the decision of the supreme court of the United States.

2. The intimation that I refused that application, and my brother judge—the circuit judge—overrode my views with regard to it, is not correct. I did not refuse it. I simply suggested that it should come from the circuit judge.

3. In the administration of these matters the course pursued is no new one. If an insolvent body, like this vast corporation, cannot meet its obligations, what is to be done? That was the question presented to the court. Proceed to conserve the rights of every one, and in doing so, if any one of the varied parties, by sectional divisions or otherwise,—creditors at large, no matter who they were,—are dissatisfied, we say, make your application to the court, if you prefer, and get out of the system. The court will give you leave so to do, and it has so permitted many of them to do; and in the very terms of the final decree that is expressed distinctly, that all these parties in the underlying mortgages may proceed to foreclose their underlying mortgages in the proper tribunal, if those parties so desire. A great many have been separated in the course of this administration, thinking they could do better under a separate system, and the court uniformly has so ordered. Now, what is the fact? If these parties—the underlying mortgagees—choose to proceed to foreclose them, they have the unquestioned right so to do, and so this court has decided, over and over again, and expressly so stated in its final decree. But this court is not to discharge, and will not discharge, during the operation of the receivers of this court, those sectional divisions where there are underlying mortgages, until they meet their requirements, as fastened upon them by the operations of our receivers. They remain subject to all charges prior in right, even to their mortgages, or they might have come here long ago, and been discharged.