## CRAIG et al. v. CENTRAL WEST PUBLIC SERVICE CO. et al.*

## KIRKPATRICK et al. v. SAME.

### Nos. 1289, 1290.

District Court, D. Nebraska, Omaha Division. Jan. 2, 1934.

*Order affirmed — F.(2d) —.

Mullen, Mullen, Shea & Massy, of Omaha, Neb., for plaintiffs.

Crofoot, Fraser, Connolly & Stryker, of Omaha, Neb., for defendants.

Kennedy, Holland & De Lacy, of Omaha, Neb., for interveners.

DONOHOE, District Judge.

The subject-matter of these two suits is the same. In the Craig case the question of venue is involved. In the Kirkpatrick case jurisdiction and venue is conceded. We have concluded on our own motion to consolidate these actions, and consequently need not consider the question of venue at this time.

An exhaustive hearing on the objections of the defendant company and of the interveners to the appointment of a temporary receiver has been had. Voluminous briefs of the parties have been filed and oral arguments made. We think that the questions raised, pertaining to the right of plaintiffs to the relief prayed for, are properly matters for the hearing on the merits. The question that we are confronted with now is, Should the court, in its discretion, appoint a temporary receiver to operate and conserve the property, pending litigation, upon the showing that has been made?

We think the following pertinent facts clearly appear from the evidence:

(1) The defendant Central West Public Service Company is a public utility engaged in the business of furnishing electric energy, telephonic communication, and ice to more than 66,000 homes and business houses in something like 500 communities. It operates as a unit with its headquarters in Omaha. It owns and holds franchises which entitled it to occupy streets and public places in the various communities which it serves, and has little, if any, competition in the greater part of its territory. In its operation its various companies are interlocking and interchanging. It has interchanging contracts in its telephone service with outside companies. The good will of its customers, which is largely based on service, is a very material asset.

(2) That the defendant Central West Public Service Company is now, and has been for a long time past, wholly insolvent. Its funded debt is $13,499,000, of which a principal sum of $2,800,000 is in default. It owes matured interest on its funded debt of $800,000. It has outstanding ordinary accounts payable of $113,000. Its unpaid tax is for the year ending October 31, 1933, in the amount of $139,477.71. There is litigation pending with the United States over a claim of the government for unpaid income tax aggregating $110,300.28. There are so-called gold notes past due since August 1, 1932, held by the public unpaid, amounting to $10,500. The only cash available to satisfy these debts is something less than $50,000. It seems to be conceded by every one that it is impossible to refinance these debts at this time even at an exorbitant cost. Litigation is now pending, and other suits are likely to follow.

(3) The company is operating at a loss of upwards of $300,000 per year without considering depreciation.

(4) The so-called "Voluntary Plan and Agreement of Adjustment and Refunding" has failed for want of agreement, and no promise of relief from that source is at hand. The plan was formulated in the original instance as to principles by the management, and some alterations were made after consultation with some of the holders of securities. The plan was started in the fall of 1932, and the management of the company has spent up to this time $90,000 of the company's moneys in an endeavor to secure agreement. This money was expended for depositary fees and expenses, commissions to investment security dealers for their efforts in obtaining deposits, expense of printing the plan and letters sent out to holders, engraving and printing certificates, postage and mailing, carrying on a tremendous amount of correspondence with holders, clerical hire, and attorney fees. From the copies of the letters sent to the holders, which are in evidence, the proposition was squarely put up to them that it was either agree to the plan or foreclosure proceedings would inevitably follow. From this tremendous effort and waste of the company's money, what is the result?

We find that the following have failed or refused to deposit their securities and submit to the plan: Holders of coupons first lien collateral bonds series A and B, whose claims amount in the aggregate to $91,200; holders of bonds and coupons, series C, principal $300,000; holders of 6 per cent. debentures, $476,500; holders of 7 per cent. debentures, $536,500—making a total of $1,-404,200 in amount of bonds and coupons whose owners seemingly prefer the alternative put up to them by the officers of the company. In addition, holders of cumulative preferred stock, series A, in amounts aggregating 38.4 per cent. of the outstanding and holders of cumulative preferred stock,

series B, in amounts aggregating 42.9 per cent. of the outstanding of that issue, have failed or refused to become parties to the plan.

No hope of ultimate agreement can reasonably be indulged. A simple analysis of the plan convinces one that there is no likelihood of agreement. Its primary purpose seems to be to secure a waiver of time and manner of payment on the part of the holders of securities, and a surrender by such holders, of title, possession and dominion over their securities, and, in addition, an attempt on the part of the officers of the company to perpetuate themselves and their appointees in the management of the properties.

That the holders of a considerable amount of such securities would not agree could easily have been foreseen at the beginning. In any event, we feel safe in saying the so-called plan has utterly failed.

(5) There is no value in the capital stock of this company; the real owners or parties in interest are the bondholders. The funded debt is so large and the interest thereon so much that any expected upturn in business conditions within the time required will not remedy the situation.

(6) There has been gross mismanagement, if not fraud, on the part of the officers of the company in the management. Mention need only be made of some of the facts appearing in the evidence. They voted dividends on the stock when no moneys were available and payments on the bonds were due or soon to become due. They spent $90,000 in a vain attempt to perpetuate themselves and their appointees in the control and management of the properties. They have made payment of interest coupons which matured November 1, 1932, to the holders who submitted to their so-called plan while withholding payment from those who did not.

On the foregoing findings of fact and the reasonable deductions and inferences to be drawn therefrom, we are asked by the plaintiffs to appoint a temporary receiver to operate and conserve the property pending a hearing on the merits.

The defendant Central West Public Service Company and the two intervening bondholders strenuously object. They concede that such an appointment rests in the sound judicial discretion of the court, but contend that the power should be exercised with great care and utmost caution; that it is not the duty or process of a court to take into its possession and hold the business affairs of others for the primary purpose of reorganizing the business.

Good authority is cited in support of their contention, but an analysis of the cases disclose that they in most instances involve solvent corporations or where the insolvency is questionable and where a public interest is not involved.

We have an entirely different situation. Here we have a public service corporation supplying necessities of life in something like 500 communities. It is a constant daily requirement. If the service falters or fails, the public must be served elsewhere. Other plants will be installed. Municipal projects will be promoted. Contracts and franchises will be canceled or withheld. Competing lines will be erected. In fact, there will be a general breakup of the operating structure, with the resulting depreciation and loss of good will and value as a going concern.

As heretofore stated, the real owners are the bondholders. The capital stock has long since ceased to have any value. The real owners are in discord, and there is no promise of concerted action. The other party in interest, the public, by virtue of whose franchises this company has occupied their premises and who are now dependent upon it, have a special claim to the consideration of the court.

We think the case at bar is governed by another line of decisions, holding in effect that, in case of a utility where a public interest was involved, and there was a likelihood of a failure of service, or a breaking up of the system, a receiver should be appointed.

In the case of Quincy M. & P. R. Co. v. Humphreys, 145 U. S. 101, 12 S. Ct. 787, 793, 36 L. Ed. 632, Judge Fuller, in considering a like situation pertaining to a railroad, in the opinion said: "Reasonable time had necessarily to be taken to ascertain the situation of affairs. The Quincy Company, as a quasi public corporation operating a public highway, was under a public duty to keep up and maintain its railroad as a going concern, as was the Wabash Company under the contract between them; but the latter had become unable to perform the public service for which it had been endowed with its faculties and franchises, and which it had assumed to discharge as between it and the other company. Its operation could only be continued under the receivers, whose action in that respect cannot be adjudged to have been dictated by the idea of keeping the property in order to sell it, or using it to the advantage of the creditors, or doing otherwise than 'ab-

stain from trying to get rid of the property.' Clearly this was no case of the employment of the property of another for one's own benefit."

In the case of Central Trust Co. v. Chattanooga, R. &. C. R. Co. (C. C. A.) 94 F. 275, 280, the court said:

"The fact that so many railroad corporations have issued bonds and mortgaged their property in advance of the construction of their railroads, and the aquisition of the property mortgaged, greatly beyond its market value at forced sale, had inclined courts of equity to treat the holders of railroad bonds, or the trustees in the mortgages, as the owners of the roads, rather than simply as lienholders, and to charge them as such owners, after default, with the unpaid expenses of operating the property. * * *

"It is true that such sales are not a reasonable test of the actual value of such property. It is, however, equally true that the conditions which generally affect such property have been found to render it not practicable to make a sale thereof in any other manner to any greater or to an equal advantage to all parties concerned therein. The practical result from these prevalent conditions is that, when a railroad corporation is unable to pay its currently accruing interest, it is actually, as well as technically, insolvent, and its property inadequate security for its mortgage debt. The larger part of the value of the property is dependent upon its continued operation as a public carrier. Its successful operation and ability to earn income are in most cases largely dependent on the railroad's connections, and its friendly relations with other carriers, and on the good will it has secured. And while the appointment of a receiver is not a matter of strict right, and such applications always call for the exercise of judicial discretion, these imminent conditions bearing upon such property, after default by the mortgagor in the payment of interest on the mortgage debt, give to an application for the appointment of a receiver great force, and the practice to grant the prayer therefor in such cases has become settled."

And I quote the following from the opinion in the case of Brassey v. New York & N. E. R. Co. (C. C.) 19 F. 663, 666: "The fact that the corporation was at a standstill, so far as the payment of its debts and obligations was concerned, existed. The fact that no duty rested upon the directors or upon the stockholders to lend money upon unsecured notes and thus to meet these obligations

seems to me to be plain. The directors owed two duties—one to the public, that this road should be kept in running condition so that it could serve the public; the other to the stockholders and to the bondholders, that if possible the property might be kept intact and preserved, so that finally unsecured and secured creditors might be paid and the stock might be saved, and they were called upon to take all proper measures to discharge these two duties."

And in the case of Mercantile Trust Co. of New York v. Missouri, K. & T. R. Co. et al. (C. C.) 36 F. 221 (syllabus 2), 1 L. R. A. 397, it was held: "2. Same—Receivers—Appointment. That a railroad, heavily mortgaged, has made several defaults in the payment of interest, aggregating over $1,000,000; that the business is decreasing, with probability of further decrease from competition with new lines; that it is in need of repairs and improvements; that the bondholders are not in harmony; that a foreclosure is about to be decreed; and that no other way exists for applying the rents and profits of the road to its debts,—are sufficient reasons to justify the appointment of a receiver."

The following are the principal reasons for the appointment of a receiver assigned by Judge Brewer, who wrote the opinion in that case: "Those are the principal reasons that have operated on my mind,—the default in interest, the fact that the rents and profits can only be appropriated in this way, the decreasing revenues, the recent construction of parallel roads, the fact that it passes through such a portion of territory so unprofitable, the condition of the road as developed by this report of the committee, and the conflict between various parties having real and substantial interests." The following cases are to the same effect: Central Trust Co. v. Wabash, etc., Railroad Co. (C. C.) 29 F. 618, 623; St. Joseph & St. L. Railroad Co. v. Humphreys, 145 U. S. 113; 12 S. Ct. 795, 36 L. Ed. 690; Sage v. Memphis & L. Railroad Co., 125 U. S. 361, 8 S. Ct. 887, 31 L. Ed. 694; Brown, B. & Co. v. Lake Superior Irons Company, 134 U. S. 530, 10 S. Ct. 604, 33 L. Ed. 1021; Hollins v. Brierfield Coal & Irons Co., 150 U. S. 382, 14 S. Ct. 127, 37 L. Ed. 1113.

The defendant and interveners earnestly urge that the appointment of a receiver is of such a drastic nature that a court of equity will exercise its power of appointment sparingly, and then only when abuses may not be eliminated by an injunction.

888

We recognize and respect that rule, but in this case the defendant company is civilly dying. A court has no more power by an injunction to stay the approach of death to an artificial person any more than to a natural person. And finally we are importuned to hesitate in the appointment because of the tremendous burden and responsibility a receivership will bring to the court. Having arrived at the conclusion that it is our duty to appoint a receiver, we would be derelict and delinquent indeed were we to evade the performance of that duty in order to avoid added work and responsibility.

The order of the court is therefore that Charles F. McLaughlin of Omaha, Neb., will be appointed receiver charged with the obligation of operating and preserving the property pending a hearing on the merits; that his bond be fixed at the sum of $100,000. Exceptions will be allowed the defendants and interveners.

The attorneys for the plaintiffs will prepare formal orders in keeping with this opinion and submit them to the court for its approval.