**FARMERS GRAIN CO. et al. v. TOLEDO, P. & W. R. R. et al.**

Civil Action P–787.

District Court, S. D. Illinois, N. D.

June 6, 1946.

Supplemental Opinion July 3, 1946.

Cassidy, Sloan & Crutcher, by John E. Cassidy, John F. Sloan, Jr., and Stanley W. Crutcher, all of Peoria, Ill., for plaintiffs.

Clarence W. Heyl, of Peoria, Ill., Scott, MacLeish & Falk, Charles M. Price, C. Lyman Emrich, Jr., and David W. Jasper, Jr., all of Chicago, Ill., for defendants.

Louis F. Knoblock, of Peoria, Ill., for defendant Brotherhoods.

ADAIR, District Judge.

This is a suit in equity brought by 19 Illinois residents, some who have sued as individuals, some as individuals doing business as partnerships and others as corporations. The action is against Toledo, Peoria and Western Railroad, a corporation, and 13 railroad Brotherhood Unions and certain individuals, officials of the Unions.

The complaint filed February 21, 1946, avers that defendant railroad stopped its rail service of interstate commerce on October 1, 1945, and plaintiffs pray for appropriate equitable relief to compel resumption of service for them as shippers and for all members of the public similarly situated. The complaint recommends the issuance of an injunction and appointment of a receiver to operate the railroad as an efficient and effective remedy.

The complaint avers that defendant railroad was granted a corporate Charter by the State of Illinois in 1926 to operate a common carrier by rail, and was also granted a franchise by the Interstate Commerce Commission in 1926. That it has a total capital stock of $5000 consisting of 50 shares of common stock with a par value of $100 each and that George P. McNear, Jr., has complete control of the management and operation of the corporation.

It is also averred that the railroad engaged as a common carrier for many years prior to 1942 and transported freight from Effner, Indiana, through the State of Illinois to Keokuk, Iowa, and to and between intermediate points. It is averred the defendant brotherhoods are labor organizations of railroad workmen and representatives of employees of defendant railroad and that the individual defendants are brotherhood officials. The complaint avers that when fully staffed the railroad employs about 600 employees. That competent railroad employees are individuals of skill and training and require experience to efficiently serve in the transportation of Interstate Commerce and that in the Midwest area of the United States practically all experienced individuals of sufficient skill in this respect are members of defendant Brotherhood Unions.

Plaintiffs allege that in October, 1940, that the two Brotherhoods of Engineers, Firemen and Trainmen became union representatives of certain employees of defendant railroad after which negotiations were entered with the aid of mediator under the national Railway Labor Act, 45 U.S.C.A. § 151 et seq., but that such negotiations and mediation terminated in November, 1940, without an agreement. Both sides then rejected arbitration under the Act and the employees voted to withdraw from service on December 9, 1941, but upon the bombing of Pearl Harbor indefinitely postponed such withdrawal. That the National Mediation Board again proposed arbitration and the defendant brotherhoods and their representatives accepted but defendant railroad refused.

It is averred by plaintiffs that on December 20, 1941, the railroad served notice

on the employees that the railroad's rates of pay and working conditions would go into effect December 29, 1941, and as a result the brotherhoods withdrew from service at 6:00 p.m., December 28, 1941. That on January 3, 1942, the railroad filed its complaint in the U. S. District Court at Peoria, Illinois, for an injunction and after evidence such relief was granted but thereafter the Supreme Court of the United States in Brotherhood of Railroad Trainmen v. T. P. & W. R., 321 U.S. 50, 64 S.Ct. 413, 416, 88 L.Ed. 534, 150 A.L.R. 810, held the railroad was not entitled to relief because it "did not make every reasonable effort to settle the dispute as required by the Norris-LaGuardia Act [29 U.S.C.A. § 101 et seq.]."

The complaint avers that the railroad filed an embargo in December, 1941; that the President of the United States requested defendant railroad to arbitrate; that it refused and on March 21, 1942, the President directed that the management of defendant railroad be taken over by the Office of Defense Transportation.

Plaintiffs allege this order of the President was fulfilled and that from March 22, 1942, to October 1, 1945, the defendant railroad was operated by a Federal Manager who made schedules and rates of pay and working conditions with defendant brotherhoods, which schedules were substantially the same as those in effect on all other railroads in the United States. That while working under such rates of pay and working conditions for approximately 3½ years, defendant railroad gave efficient and uninterrupted service to all shippers and produced a net operating profit of $7,650,000.

It is also averred by plaintiffs that the Office of Defense Transportation ordered on September 6, 1945, that defendant railroad be returned to its own corporate management. That on September 13, 1945, defendant brotherhoods by letter notified the President of the Railroad that they desired a conference at the railroad office in Peoria on September 19th, for the purpose of an agreement to continue in effect rates of pay, rules and working conditions enjoyed by employees under Federal Management. That the defendant railroad replied by letter September 15, 1945, and stated that it would not be proper to sign agreements with the brotherhoods or to meet with them and declined the conference.

It is averred by plaintiffs that defendant railroad was turned back to its corporate management October 1, 1945, and that four-fifths of all employees withdrew from service of defendant; that defendant railroad filed an embargo declining acceptance or delivery of freight and ceased transportation of interstate and all commerce. It is averred that connecting railroads declined interchange of freight. That defendant railroad has permitted essential equipment to deteriorate and joint crossings with other railroads to become useless through disrepair; that members of defendant brotherhoods have picketed the defendant railroad; that there has been resulting strife and the necessity for a guard of a large force of State Police; that two pickets were shot and killed by guards of defendant railroad and three other pickets wounded; that there has been a resulting condition of lawlessness and disorder and for all practical purposes the operation of defendant railroad was abandoned and plaintiffs have been denied rail service and sustained enormous losses to their businesses and irreparable losses of customers and have suffered irreparably in other respects.

The complaint sets forth quotations from some laws of the United States declaring the public policy with respect to transportation, the duty of common carriers to serve the public the obligations of officials of common carriers to engage in collective bargaining and the duties of union representatives in similar respects. It avers that Mr. McNear, the railroad President, has refused to engage in collective bargaining in good faith and substantially alleges that he has followed a course which has been arbitrary, capricious and one not reasonably calculated to fulfill the object of the laws of the United States, particularly as set forth in the Railway Labor Act, 45 U.S.C.A. § 151 et seq., Transportation Act of 1920, 49 U.S.C.A. § 71 et seq., and

National Labor Relations Act, 29 U.S. C.A. § 151 et seq.

It is averred by plaintiffs that employees who are members of defendant brotherhoods are ready and will return to work and resume rail service and the free flow of interstate commerce under the same conditions and rates of pay that were in effect from March 22, 1942, until October 1, 1945, when defendant railroad was operated by the United States Government at a substantial profit.

The railroad's answer admits its Charter, Interstate Charter, Franchise from the United States Government, its capital of $5000 with 50 shares of stock, and when fully staffed that it employs 600 persons; that the Brotherhood of Trainmen represented certain employees after November 27, 1940, and that there were unsuccessful negotiations thereafter.

It admits it declined to arbitrate in December, 1941, and that the Government took over management of the Railroad on March 22, 1942, as averred in the complaint. It denies it refused to engage in collective bargaining in good faith. Admits it received a letter from the brotherhood in September, 1945, as averred, and also that it refused to meet said brotherhoods but avers it did not know who said brotherhoods were representing and that at such time, it, the railroad, had but five employees. It avers that after the men withdrew from service on December 28, 1941, that it was able to give full service to all shippers; that at the time its management was taken over by the Government on March 22, 1942, it was giving the fastest and most efficient service in the history of the railroad.

It denies that its letter of December 20, 1941, specifying rules and working conditions caused the withdrawal of employees from service on December 28, 1941. It denies that it is necessary to have individuals of training and skill to operate its equipment as alleged in the complaint or that it is necessary to enter into an arrangement or contract with defendant brotherhoods in order to operate the railroad. It avers that plaintiffs have not exhausted their administrative remedy before the Interstate Commerce Commission.

The answer of the railroad alleges that the sole dispute in 1941 was about working conditions which it put into effect on December 20, 1941. It admits that it has not operated its rail facilities and has not provided service to plaintiff shippers or other members of the public since October 1, 1945. It avers it has not done so because of threats by striking employees and members of defendant brotherhoods, lawless acts, interference with its trains, general violence and failure of law enforcing officials to supply needed protection.

Defendant railroad denies that it has abandoned either the railroad or its operations. It avers that it will operate and supply complete rail service to plaintiffs and other shippers if its trains and equipment are not interfered with, and it avers that there is no ground for the appointment of a receiver and the plaintiffs' case should be dismissed.

The defendant railroad filed a cross-complaint against the other defendants, i.e., the brotherhoods and union officials, in which it charges violence, interference with defendant's trains and equipment and working employees, and prays for an injunction restraining defendant brotherhood union officials and others from interfering with defendant railroad's operation or molestation of its employees. All defendant brotherhoods and union officials filed their joint answer in which they admitted the material allegations of the complaint about the railroad, history of the dispute with the defendant carrier, their request to the railroad and its rejection for a meeting in September, 1945, and their agreement with the Federal Manager for employment of their members, between March 22, 1942, and October 1, 1945. The brotherhood and union officials, defendants, admit they are ready and will resume their employment at the same rates of pay and under the same working conditions that were in effect under the Federal Manager. Defendants deny they committed acts of violence or engaged in unlawful interference with defendant railroad's operation and aver that defendant railroad acting through its employees and others have engaged in violence toward members of the brotherhoods.

Defendant brotherhoods and union officials filed their answer to the railroad's cross-complaint and denied the railroad is entitled to an injunction under the evidence or the law.

Before presentation of evidence plaintiffs presented their application for appointment of a temporary receiver on the facts set forth in the verified complaint and upon the facts admitted in the affidavits filed by the defendants. The court reserved ruling on such appointment for a temporary receiver and still has such application under advisement.

At the conclusion of the evidence by the plaintiffs, defendant railroad entered its written motion to dismiss the suit against it and the other defendants also filed their separate motion for dismissal. The Court took both motions with the case and they are still under advisement.

### Findings of Fact

The Court makes the following findings of fact from the pleadings and the evidence:

1. The plaintiffs are individuals, corporations and partnerships, who are and have been engaged in their respective businesses in the State of Illinois and along the defendant Railroad for many years. The operation of their businesses largely depends upon delivery of goods in interstate commerce over defendant railroad to the plaintiffs, and the acceptance by the railroad of shipments and products of the plaintiffs for interstate transportation and delivery to plaintiffs' customers. Practically all of plaintiffs have no available rail facilities except defendant railroad. The plaintiffs brought their action for themselves and all other members of the public similarly situated. Since October 1, 1945, plaintiffs and the public have needed and repeatedly requested rail service by defendant but at all times have been deprived of and denied such service. The Court finds as a fact that at all times since October 1, 1945, plaintiffs and others of the public similarly situated have continuously sustained large losses in their respective businesses as a result of failure of rail service on defendant railroad, that such losses are in many respects irreparable and will continue until service is resumed.

2. Defendant Toledo, Peoria & Western Railroad is an Illinois corporation, authorized by its Charter issued in 1926 and a franchise issued by the United States Government through the Interstate Commerce Commission to engage in the business of a common carrier by rail. The defendant railroad since its authorization has transported commerce as a common carrier from Effner, Indiana, to Keokuk, Iowa through the State of Illinois, and to and between intermediate points, and in these respects daily served plaintiffs and a large number of shippers in the transportation of both intra and interstate commerce. A number of other carriers by rail intersect defendant railroad and a large quantity of defendant railroad's traffic has been freight interchanged with such intersecting railroads. Defendant railroad has a capital of $5000 with an authorized 50 shares of common stock. With the exception of three shares, all of such stock is owned by the Railroad Securities Corporation; that George P. McNear, Jr., has continuously been President of defendant railroad since 1927 and is the owner of 1000 shares of the total authorized corporate stock of the Railroad Securities Corporation and Flynn & Co. is the owner of the remaining or 171 shares of such corporation; that said McNear has at all times controlled both the Railroad Securities Corporation and defendant railroad in all respects. There are no Vice Presidents of defendant railroad. The Secretary and Treasurer are salaried employees under the supervision of Mr. McNear and the three members of the Board of Directors are: Mr. McNear, R. B. Gifford, a salaried employee of the road, and H. K. Florine, a salaried stenographer, both of whom are under the supervision of Mr. McNear. Mr. Gifford and Miss Florine were given one share of corporate stock by Mr. McNear to qualify them as Directors, whereupon each endorsed and returned the certificate to Mr. McNear's custody. The Directors of the Railroad Securities Corporation have been Mr. McNear and attorneys in his employ. The Court finds the fact to be that George P. McNear, Jr., has at all times controlled

and dominated defendant railroad in all respects. The Court also finds that since October 1, 1945, defendant railroad has not operated its facilities and since that date has not provided or supplied service by rail to the plaintiff shippers, and to other members of the public similarly situated, even though repeatedly requested by plaintiffs and others to supply such service. The Court finds that as a result of its non-operation since October 1, 1945, the locomotives, cars and equipment of defendant railroad have not been used and have deteriorated and that the corporation has continuously sustained large losses of revenue and has been deprived of large gains and profits and that the stockholders of defendant railroad have been injured in their rights of property and such losses in many respects are irreparable and will continue until defendant railroad resumes operations and rail service.

3. The defendant brotherhoods are organizations composed of railroad employees, the membership of each brotherhood usually being the railroad craft or class of workers which the brotherhood name signifies. Individual defendants are officials of the defendant brotherhoods. Employees on other operating railroads although not members of the same local organizations are members of the same national and international brotherhoods.

4. In October, 1940, the Brotherhoods of Railway Enginemen, Firemen and Trainmen became the lawful representative for Locomotive Engineers, Firemen and Trainmen in the employ of the defendant railroad. A few weeks thereafter defendant railroad submitted its proposals for rates of pay, and working conditions. Negotiations ensued the remainder of 1940, and intermittently until November, 1941. In these negotiations the brotherhoods were represented by brotherhood officers, the railroad by General Manager Best, Trainmaster Gifford and Attorney Sprague, all three salaried employees of the railroad. Mr. McNear, the President, did not personally participate in any of the conferences of negotiations, but at all times kept a close and strict supervision over the railroad's conferring representatives. The negotiating conferences in 1941 were attended by Mediator Murray of the National Mediation Board. The negotiations terminated in October, 1941, without an agreement. During approximately such twelve months of negotiations the brotherhoods steadfastly refused to accept the rules for working conditions proposed by the railroad. After the end of mediation on November 6, 1941, the National Mediation Board requested the railroad and brotherhoods to arbitrate the dispute, both refused and on December 6, 1941, the employee members of the brotherhoods voted to strike or withdraw from service on December 9, 1941. Upon the bombing of Pearl Harbor, December 7th, and at the request of the Mediation Board, the brotherhoods indefinitely postponed the strike and immediately thereafter said brotherhoods agreed to submit to binding arbitration under the terms of the national Railway Labor Act, but the defendant railroad refused. On December 20, 1941, when the Nation was at war, the railroad operating, and the strike postponed, Railroad President Mr. McNear sent a letter to the employees and informed each that the rates of pay and rules for working conditions which the brotherhoods had continuously rejected would go into effect at 12:01 a.m., December 29, 1941. When the contents of the letter became known the National Mediation Board again requested arbitration because of the war emergency and the brotherhoods again accepted but the railroad refused and the engineers, firemen and trainmen withdrew from service on December 28, 1941.

5. On January 3, 1942, the railroad filed its complaint for an injunction in this Court to restrain violence or interference with its trains or property and after a hearing the injunction was granted but later set aside by the Supreme Court of the United States in Brotherhood of Railroad Trainmen v. T. P. & W. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 for the reason that this Court was without jurisdiction to grant the railroad relief because the evidence showed the railroad had failed to use every reasonable effort to settle the dispute as required by law.

6. Between the withdrawal from service on December 28, 1941, and March 22, 1942, all classes of employees except those on

strike, i.e., engineers, firemen and trainmen remained at work and defendant railroad supplanted the strikers with new employees. The evidence shows that some of these new employees were inexperienced and incompetent; that during the period there was a frequent turnover of operating employees and according to the testimony of General Manager Best the railroad was only able to operate at not more than twenty-five per cent of its capacity. The defendant offered evidence in the nature of a comparative compilation of freight cars handled in that period and a similar period when there was full operation tending to show that more cars were handled from December 28, 1941, to March 22, 1942. The Court finds the fact to be, however, that from December 28, 1941, to March 22, 1942, some of defendants' operating employees were not competent for their positions and that the railroad did not fulfill its duty to provide prompt, complete and efficient transportation service by rail for the shipping public.

7. On February 27, 1942, the National War Labor Board ordered the brotherhoods and the railroad to arbitrate the dispute so as to obtain necessary resumption of rail service for the country's war effort. The brotherhoods agreed but defendant railroad again refused. On March 16, 1942, the President of the United States by a written Executive Order found that it was essential that defendant railroad be operated by or for the United States in order to assure successful prosecution of the war. The President also found that on February 27, 1942, the National War Labor Board directed that the dispute between the railroad and its employees be submitted to arbitration; that the employees had agreed but the railroad refused despite urgent request by the President of the United States. The President directed that the Office of Defense Transportation "shall manage or arrange for the management of said Railroad under such terms and conditions of employment as he deems advisable and proper pending such termination of the existing labor dispute as may be approved by the National War Labor Board." In obedience to the President's order the corporate management was supplanted and the railroad was managed and operated by the United States Government through the Office of Defense Transportation from March 22, 1942, to October 1, 1945.

8. When the Office of Defense Transportation assumed management on March 22, 1942, it agreed with the two Brotherhoods of operating employees, Enginemen, Firemen and Trainmen, that the rules for working conditions and rates of pay which were in effect on defendant railroad before and on December 28, 1941, would be resumed until a new contract could be negotiated and the brotherhoods agreed for the immediate reemployment of operating employees. On April 9, 1942, the National War Labor Board appointed Judge Benjamin Hilliard, Justice of the Supreme Court of Colorado, to arbitrate and decide rates of pay and rules for working conditions of the Enginemen, Firemen and Trainmen. Judge Hilliard gave notice to the Railroad President, the two brotherhoods of operating employees and the Federal Manager for a hearing before him in Chicago on May 5, 1942. The Court finds that defendant railroad did not appear at this or subsequent hearings; that representatives of the Office of Defense Transportation and the brotherhoods did appear and that at a hearing before Judge Hilliard July 2, 1942, the Office of Defense Transportation and officials of the two brotherhoods of Enginemen, Firemen and Trainmen submitted an agreement which has been approved by Joseph Eastman, Director of the Office of Defense Transportation; that Judge Hilliard thereafter reported his approval of the agreement to the National War Labor Board and on September 23, 1942, the Board issued its Directive, approving such agreement for rates of pay and rules for working conditions of Enginemen, Firemen and Trainmen on defendant Railroad. The Court further finds that subsequent to March 22, 1942, the other employees of defendant railroad designated the additional defendant brotherhoods as their lawful representatives for collective bargaining and that such brotherhoods entered into separate agreements with the Office of Defense Transportation for rates of pay and rules for working conditions of all such employees. The Court finds that the

agreements between all defendant brotherhoods and the Office of Defense Transportation were substantially the same as agreements which had been in force and effect between the employees and managements of practically all other railroads in the United States and that such agreed rates of pay and rules for working conditions were according to the general railroad standards of employment. The Court also finds as a fact that the Office of Defense Transportation acting through a Federal Manager operated and managed defendant railroad under these agreements from March 22, 1942, to October 1, 1945, and during this period supplied all shippers and the public with efficient and satisfactory transportation by rail and that such management made an operating net profit of $7,650,000.

9. The Court finds the fact to be that on September 6, 1945, the Director of the Office of Defense Transportation ordered that management of defendant railroad be returned to the private management and control by the office of Defense Transportation should then terminate. That on September 13, 1945, after this order was announced officials of the defendant brotherhoods sent a letter to President McNear of defendant railroad and requested a conference at the Peoria office of the railroad on September 19, 1945, for the purpose of discussing a continuation of the rates of pay and working conditions which had been in effect under the Federal Manager and that on September 15, 1945, defendant railroad by letter transmitted to these brotherhoods stated that it would not be proper for the railroad to make an agreement or meet with the brotherhood officials, and defendant railroad declined to participate in a meeting and defendant railroad made no alternate or other proposal in its letter. Thereafter, defendant railroad arranged to impose a total embargo against shipments. The Court finds the fact to be that on or about September 27, 1945, the employees of defendant railroad voted to withdraw from service on October 1st, and that on September 28 and 29, 1945, defendant railroad sent its attorney to the brotherhood officials with certain proposals which the brotherhood officials would not accept; that on October 1, 1945, practically all employees of defendant railroad withdrew from service. The Court finds from the evidence that by their letter of October 13, 1945, defendant brotherhoods made a bona fide effort for collective bargaining and that the defendant railroad unreasonably frustrated this effort. The Court also finds that after this letter that neither defendant railroad or defendant brotherhoods made any reasonable effort to negotiate and engage in collective bargaining prior to the employee's withdrawal from service and cessation of rail transportation on October 1, 1945. The Court also finds that on October 9, 1945, and several subsequent occasions representatives of the plaintiff shippers and others of the public made sincere and reasonable efforts to bring representatives of all defendants into agreement for the resumption of rail service and that others including the Governor of Illinois and the State Commerce Commission took similar steps for the same purpose but that all of such efforts toward mediation and adjustment were unsuccessful and the Court finds the fact to be that the defendants have maintained an unreasonable disregard for the rights of plaintiff shippers and have acted contrary to the public welfare.

10. The Court finds defendant railroad's answer admits that it has not operated its railroad to supply interstate transportation for plaintiffs, and the public since October 1, 1945, and that the railroad avers that it has been unable to operate and supply such service because of violent interference with its equipment and threats to employees and others who are willing to work, by members of defendant brotherhoods. The Court finds from the evidence that striking employees of the railroad have continuously engaged in picketing since their withdrawal from service on October 1, 1945; that hostility has been manifested between them and some employees who have continued at work; that on one occasion a picket was shot by an armed guard of the railroad and that such guard was arrested and acquitted in the County Court of Tazewell County. That on another occasion an employee of the railroad was assaulted and punched by a picket; that on two occasions cuts of rail-

way cars were stopped near a group of pickets and the angle cock on one of the cars was tampered with; that electric wires and other utilities to defendant's railway yards were severed, but there was no proof who committed the wrong; that some employees of defendant were followed on the public streets and threatened; that shots were fired into the railroad yards at night by unknown persons and on another occasion shots were fired into a picket's shanty by unknown persons. The homes of two employees were stoned but the identity of the assailants was not proved; that on February 6, 1946, some pickets threw stones at a cut of cars before and at the time it reached Gridley, Ill., and armed guards of defendant railroad shot and killed two pickets and injured three others; that since October 1, 1945, one individual connected with defendant railroad was attacked by a picket, and sufficiently injured to require hospital and medical attention, but no other person connected with defendant railroad has been injured so as to need medical attention; that since cessation of rail service in October, railroad officials have sent telegrams and other communications to local law enforcing officials and the Governor of Illinois, and the President of the railroad requested the Governor to send the State Militia for protection, which the Governor declined; that after October 1, 1945, State Police officers as a result of requests by the railroad, and also by the brotherhoods, have been on guard in Peoria and Tazewell Counties to prevent disorder. During part of the time as many as sixty State Police officers were assigned to such duty; that except for broken caboose and engine windows and the aforesaid severance of utilities there has been no substantial damage to the railroad's equipment or property. The Court finds from the evidence that after the employees' withdrawal from service on October 1, 1945, defendant railroad purchased a substantial quantity of firearms and ammunition and manned its cars with armed guards and that some of its employees in the railroad yards were armed. The Court finds from all the evidence, and the testimony of a number of Sheriffs, State Police officers, Mayors and Chiefs of Police that the requests of all defendants conveyed to law enforcing officers were reasonably complied with, and that defendant railroad's failure to operate was not justified by the railroad's charge that public officials refused or were unable to perform their duty. The evidence shows no application by the railroad to any Court for judicial relief since October 1, 1945, until its cross-complaint filed in this suit on April 15, 1946. The Court finds that although incidents of violence occurred and that a hostile and provocative attitude by pickets and also employees of defendant railroad was a hazard to the public peace and safety; that the Court cannot find that such violence was a sufficient justification for the failure of defendant railroad to operate its trains unless the Court could also find or presume from the evidence that local law enforcing officials and the Executive Officers of Illinois had refused or were unable to perform their official duties. The Court cannot indulge in such presumption and the evidence does not permit such finding.

11. The evidence shows, and the Court finds it to be a fact, that the safe and efficient transportation of interstate and other commerce by rail requires the service of experienced, trained and competent railroad employees and that not less than ninety per cent of all available railroad workers of sufficient skill and training to operate railroad equipment and trains are members of the different brotherhoods of railroad workers. The Court also finds that essential, connecting rail carriers of defendant, i. e., the Peoria & Pekin Union Railroad, the M. & St. L., and the Chicago Burlington & Quincy, have since October 1, 1945, refused to interchange freight with defendant railroad because of the danger to their employees arising out of the presence of armed guards on defendant's trains and property, and because of the hazard due to the incompetency of some of defendant railroad's engine crews. The Court further finds the fact to be that since October 1, 1945, defendant railroad has not kept two of its railroad crossings with other railroads in sufficient repair to permit the movement of trains on defendant railroad. The Court finds that one of the principal reasons for the failure of

854

defendant railroad to operate its trains and provide rail service since October 1, 1945, has been that the railroad did not have in its employ a sufficient force of trained and experienced railroad workers to operate said trains and man its equipment, and that such insufficiency of workers was the result of the railroad's unreasonable refusal in September, 1945, to meet the defendant brotherhoods, and bona fidely engage in collective bargaining and that such insufficient force of workmen was also the result of the unreasonable and obstinate attitudes of all defendants and their refusal to make concessions and their failure to genuinely negotiate and bargain for the joint welfare of the employees, the railroad corporation and the public.

12. Defendant railroad avers in its answer that plaintiffs are not entitled to relief by the Court because they have failed to request and exhaust administrative remedy by the Interstate Commerce Commission. The Court finds from the evidence that plaintiffs did present their complaint to the Interstate Commerce Commission on more than one occasion since October 1, 1945, and were advised by that body that it could not afford relief. The Court also finds under the facts of this case that the Commission did not have the power to afford an adequate or sufficient remedy.

13. The pleadings and evidence show that this dispute between the two defendants arose sometime in the beginning of the year 1941. The contention of both parties arose by reason of wages and working conditions proposed by the railroad company which finally resulted in a strike and walkout of two of the brotherhoods in December of 1941. The railroad company was in possession of the property until March 1942, when the Government of the United States possessed said property and placed a Manager in charge. From December 1941 to March 1942 many acts of violence were perpetrated by the striking workers of the railroad company. These conditions were intercepted and relieved by the appointment of a Federal Manager who made a contract with the brotherhoods which existed until October 1, 1945, when said road was returned to the railroad corporation. From October 1, 1945, until the present date, all the brotherhoods of said railroad refused to work and violence has been prevalent on the part of both membership and employees from that day to the present time. Almost the same questions remain now as in 1941 in regard to the seniority of the brotherhoods. The railroad company contends that those found guilty of violence, together with those who are guilty of violence from October 1st, to now, should not be re-employed and that the employees hired by the railroad company in 1941 and 1945 should receive seniority rights. There have been concessions in regard to this particular contention, but no agreement has been reached, and rules and working conditions are not agreed upon. From October 1, 1945, until the present time there has been considerable violence on the part of the present employees of the railroad company and pickets and strikers, until conditions almost justify the statement that a state of war exists between these two opposing factions. Since the start of this trial, which has consumed more than four weeks' time, this court has made every reasonable effort to bring the parties together with the hope that some agreement might be reached; but to no avail. The appreciable financial loss being suffered by each of the defendants does not create any considerable relinquishment of each of the determined contentions. Therefore, in the opinion of the court, a future settlement of the determined contentions of each of the parties is highly improbable.

Conclusions of Law

1. This cause requires a determination of rights and obligations under the National Transportation Act, the national Railway Labor Act, and the franchise granted defendant railroad by the Interstate Commerce Commission, and this Court has jurisdiction.

2. A court of equity has the duty to afford adequate and prompt remedy for every wrong, especially when the wrong is injuriously affecting the public welfare.

3. The plaintiffs as shippers and other members of the public similarly situated have a right under the laws of the United States to be supplied with efficient trans-

portation by defendant railroad for shipment in interstate commerce at all reasonable times and under reasonable circumstances. The plaintiffs have been and are still being deprived of that right. Under the evidence although it was not essential for relief in this Court the plaintiffs did apply to the Interstate Commerce Commission for relief, and were informed by the Commission it had no power to aid them. The plaintiffs have exerted all reasonable efforts to induce the operation of trains and rail service on defendant's railroad. The plaintiffs appear in Court after having fully done equity.

4. The defendant railroad is a public corporation. It was organized for public purposes and has been granted valuable franchises and privileges. The business of the defendant railroad as a carrier by rail is of a public nature, and when it performs that duty it is also performing to a certain extent a function of government. The corporate officials and directors of defendant railroad, as such, are trustees for the public, and are imposed with an important public trust. Their duties as such trustees are of a higher nature under the law than any private duties they may owe to stockholders, creditors or others. Under the laws of the United States and its franchise the defendant railroad is bound to maintain its equipment in good order, run its trains, and supply efficient service for the transportation of interstate commerce. In the absence of proof that local law enforcing officers and the Executive Department of the State of Illinois have either refused or are unable to perform their public duties to keep the peace and afford protection the railroad's defense of violence and interference is not sufficient to excuse the failure to operate its trains and provide service. The evidence does not establish such a failure or incompetence on the part of such public officials.

5. The defendant brotherhoods and union officials had the legal right to represent their members in negotiations for collective bargaining, and upon withdrawal from service their members had the lawful right to engage in peaceful picketing. They had no right however to engage in violence or unlawful interference with defendant's property. Neither did defendant railroad have a right to provoke tension by the dangerous use of firearms and other provocative measures. The brotherhood representatives of the employees had the duty to abide by fair standards of employment and to negotiate with a view to the dual interests of their members as the public welfare.

6. The corporate officials of defendant railroad knew or should have reasonably known that the railroad's letter of December 20, 1941, would result in a strike and interruption of interstate commerce. Although the defendant railroad was under no legal compulsion to arbitrate, in December, 1941, January, February and March, 1942, by equitable standards the refusal of the railroad to so arbitrate and to respond to the order of the War Labor Board and the request of the President of the United States was not a reasonable discharge of its obligations to the public welfare. The refusal of defendant railroad to comply with the request of the brotherhoods for a conference on September 19, 1945, amounted to a failure of the railroad to fulfill its legal duty to engage in collective bargaining. The failure of defendant brotherhoods to request additional steps for negotiation of the railroad's proposals on September 29, 1945, constituted a lack of full effort on their part to pursue collective bargaining.

7. Under all the evidence the Court finds as a matter of law that since December, 1941, defendant railroad has followed an obstinate, unreasonable and provocative policy in its labor relations, and a course that has been inconsistent with the objects of the National Labor Relations Act. The provisions of the National Transportation Act prohibiting abandonment of operations of transportation facilities were enacted by Congress for the purpose of securing the uninterrupted and free flow of interstate commerce. Defendant railroad knew or as a matter of law should have known that the natural and probable consequences of its labor policy would result in cessation of interstate commerce and abandonment of its operations. The railroad's refusal to engage in collective bargaining in September, 1945, its imposition of an embargo in that month with the other

facts and circumstances in evidence charges it with abandonment of operations.

8. The Court has the duty to give effect to the law and the resulting duty to compel the prompt resumption of the safe, free and uninterrupted flow of interstate commerce on defendant railroad. The corporate management of the railroad either refuses or has followed a course which has resulted in its inability or provide such service. All known and available services of government agencies and officials both of the United States and Illinois have unsuccessfully tried to effect operations of the railroad. The Court consequently finds that a receiver should be appointed by this Court to operate the railroad under the Court's supervision, and that all persons should be enjoined from interfering with the receiver in the performance of his duties.

9. The Court finds that an injunction as prayed in the cross-complaint of defendant railroad against the brotherhoods and other defendants would not amount to relief sufficient to achieve prompt and complete resumption of operations on defendant railroad, and in view of the order of the Court herein for the appointment of a receiver and an order enjoining all interference with such receiver, such cross-complaint of defendant railroad should be dismissed.

It is therefore ordered, adjudged and decreed by the Court that the motion of the defendant railroad to dismiss this cause, and the motion of the defendant brotherhoods, and all other defendants for dismissal of plaintiffs' cause are hereby denied. The cross-claim of the defendant railroad for an order enjoining defendant brotherhoods, and others, should be and is hereby dismissed.

It is therefore ordered, adjudged and decreed that upon the approval of his bond in the penal sum of Ten Thousand and no/100 ($10,000) Dollars, conditioned on the faithful performance of his duties, that Fred Windish of Galesburg, Illinois, not an experienced railroad official, but an efficient businessman who has no interest on behalf of either of the defendants in this suit, be and he is hereby appointed as receiver of all of the properties, franchises and assets of the Toledo, Peoria & Western Railroad.

It is further ordered that the said receiver take possession of all of the real and personal property, franchise rights and other assets tangible and intangible of the Toledo, Peoria and Western Railroad, and to operate or arrange to operate such railroad in such manner as will furnish satisfactory and adequate rail transportation to all members of the public subject to the approval of this court.

It is further ordered and decreed that all defendants, persons, firms and corporations be and they are hereby enjoined from interfering with the receiver in obtaining possession of these properties or with his possession thereafter or with his operation of the railroad.

### Supplemental Opinion.

In view of the great public interest in the order of this Court handed down June 6, 1946, and the importance of the issue there decided, I deem it advisable to supplement the findings of fact and conclusions of law previously prepared and signed by me with a statement of the legal background for my decision. The Clerk is accordingly directed to file this opinion in the case and to notify all the parties in interest that it has been filed.

The facts are set out rather fully in the findings of fact and conclusions of law previously filed and it is unnecessary for me to repeat them here.

The first legal question facing any Federal Court is that of jurisdiction and the defendants have challenged the jurisdiction of this Court to entertain this action. The complaint, however, is based, in part at least, upon rights claimed to exist by virtue of certain statutes of the United States. It is my opinion that plaintiffs' claim to relief depends upon the construction or application of the laws of the United States; that such claim is colorable and rests upon a reasonable foundation. Jurisdiction of a complaint almost identical in this regard with the complaint filed in this case was sustained in Lucking v. Detroit & C. Nav. Co. 265 U.S. 346, 44 S.Ct. 504, 68 L.Ed. 1047. See also Toledo P. & W. R.R. v.

Brotherhood of Railroad Trainmen, etc., 7 Cir., 132 F.2d 265. I conclude that this Court has jurisdiction.

To pass to the merits of the case, the next question facing the Court is whether the plaintiffs have alleged and proven facts which entitle them to relief as against the defendants. In this connection it is first necessary to refer briefly to the common law and statutory duties of a railroad company. As was stated by Judge Love in the early case of Chicago B. & Q. R. Co. v. Burlington, C. R. & N. Ry. Co. et al., C.C.Iowa, 34 F. 481:

"Whoever, in my opinion, in a legal proceeding considers a railway company as a corporation for mere pecuniary profit to the owners of the property, without taking into account their character as quasi public corporations having public duties to perform, takes a view of the subject altogether narrow and misleading.

"It is one of the duties of government to provide and regulate public roads and highways. It is a duty of government because roads and highways are indispensible to society, and because individuals are incompetent to establish and control them. No government can rightfully delegate to individuals or corporations its high duties so far as to place them beyond its own power, supervision, and control. The collection of the public revenue is a duty of government. It has been sometimes delegated to individuals as farmers of the revenue, but no government could rightfully place the collection of the public revenue beyond its own supervision and control. It would be absurd to treat the collection of the public money by farmers of the revenue as a mere private business. They would, on the contrary, have committed to them a public business—a duty of the government, in which the whole people would have a vast interest. So it is with the railway service. It is a quasi public business. The building, equipping, and management of a railway is not strictly a private enterprise. It would not be authorized by the government solely for private profit. That could not be done within the law of eminent domain. The railway company, and all who are engaged in the building, equipping, repairing and keeping open a railroad as a public highway are performing one of the great duties of the government. The government for the time being commits to them for the benefit of the whole people a business—a public duty—in the performance of which the people have an interest which is simply incalculable. It is clearly the duty of the government in all its departments, within their respective spheres, to enforce, upon all persons engaged in a business which thus concerns the public welfare, the strict performance of their duty to the public. The stoppage of the running of a system of railways for weeks and months at a time must inevitably inflict enormous injury upon the great public, for whose convenience and use railways are authorized. By the non-operation of a railroad travel may be suspended; the merchant and manufacturer ruined for want of transportation; property of incalculable value laid up to perish by the way; whole communities deprived of their supplies of fuel and other necessaries of life, —in a word, mischiefs and sufferings may be inflicted upon the people which no words are adequate to express."

The interests of the public in the maintenance of service and adequate transportation and the corresponding duties of railroad companies have been recognized by many courts in connection with the decision of many different questions. Prior to the passage of modern reorganization statutes, railroad and other corporations involved in financial difficulties were frequently liquidated through the medium of federal equity receiverships. In connection with these matters, the problem of operating the property, even to the exclusion of rights of lien creditors, quickly became apparent and at an early day the United States Supreme Court found it necessary for the protection of public interests to authorize railroad receivers to incur obligations for operating purposes, payment of which was given priority over payment of existing secured and unsecured debts. See Wallace v. Loomis, 97 U.S. 146, 24 L.Ed. 895; Miltenberger v. Logansport R. Co., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117; Union Trust Co. v. Illinois Midland R. Co., 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963. In this latter case

the Supreme Court said (at page 821 of the Supreme Court Reporter):

"Moreover, a railroad is a matter of public concern. The franchises and rights of the corporation which constructed it were given, not merely for private gain to the corporators, but to furnish a public highway; and all persons who deal with the corporation as creditors or holders of its obligations must necessarily be held to do so in the view that, if it falls into insolvency, and its affairs come into a court of equity for adjustment, involving the transfer of its franchises and property, by a sale, into other hands, to have the purposes of its creation still carried out, the court, while in charge of the property, has the power, and, under some circumstances, it may be its duty, to make such repairs as are necessary to keep the road and its structures in a safe and proper condition to serve the public."

Furthermore, it was not always necessary that the railroad corporation be proven insolvent before the federal courts moved to appoint receivers. A very important consideration was the protection of the company and its property from the attack of creditors whom the road was unable to pay for lack of sufficient liquid assets. See Brassey v. New York & N. E. R. Co., C.C.Conn., 19 F. 663. In this case the Court said, at page 666:

"The directors owed two duties—one to the public, that this road should be kept in running condition so that it could serve the public; the other to the stockholders and to the bondholders * * *".

And on page 668 of the same decision the Court said:

"The corporation is now enabled actively and efficiently to discharge its obligations to the public from the fact that it is under protection."

See also Hackler v. Farm & Home Savings & Loan Association, D.C., 6 F.Supp. 610.

The general rule that receivers will not be directed to operate a business unless the income will clearly exceed the outgo is necessarily modified in the case of quasi public corporations including railroads, and the normal course is for the receiver, no matter how badly involved the company

may be, to operate the property under direction of the court. Central Bank & Trust Corporation v. Cleveland, 4 Cir., 252 F. 530.

Further, the receiver of a railway, some of whose operations are conducted on leased property, is entitled to operate over the leased property for a reasonable time before determining to adopt the lease or return the property to the lessor. American Brake Shoe & Foundry Co. v. New York Rys. Co., 2 Cir., 282 F. 523. If he, at the end of the trial period, returns the property to the lessor he need only pay over to the lessor the net earnings of the leased line during the period of provisional operation. United States Trust Co. v. Wabash W. R. Co., 150 U.S. 287, 14 S.Ct. 86, 37 L.Ed. 1085.

It thus appears that the interests of the public and the duty of the carrier to continue to provide transportation are given precedence over the interests of secured and unsecured creditors, lessors, bondholders and stockholders, and that the public's right in the matter has always been preferred to the property rights of all other persons.

So far the public rights have been considered without reference to the existing statutes of the United States. Section 1(4) of the Interstate Commerce Act, Title 49, § 1(4), U.S.C.A., provides in part as follows:

"It shall be the duty of every common carrier subject to this chapter * * * to provide and furnish such transportation upon reasonable request therefor * * *".

This section of the statute is merely declaratory of the common law duty of every carrier. The right of shippers to insist upon transportation under this section by bringing action in their own name in the courts has been upheld in many decisions. See Louisville & N. R. Co. v. F. W. Cook Brewing Co., 223 U.S. 70, 32 S.Ct. 189, 56 L.Ed. 355; Stephen v. Ohio State Telephone Co., D.C., 240 F. 759. The shippers in this case rely upon another section of the Interstate Commerce Act, namely, Section 1(18), Title 49, § 1(18), U.S.C.A., which provides in part as follows:

"* * * and no carrier by railroad subject to this chapter shall abandon all or

any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment * * *".

■ There is no pretense here that any such certificate has ever been asked for or granted. Plaintiffs claim that this section of the statute gives them further rights which they may assert in this court. With this contention I agree, providing there has been an abandonment within the meaning of the foregoing statute. In the case of Lucking v. Detroit & C. Nav. Co., 6 Cir., 284 F. 497, the court, it seems to me, recognizes the right of a private shipper to sue on behalf of himself and all others similarly situated under this section, as well as other sections of the Interstate Commerce Act. It is strenuously argued, however, by the defendant railroad that in no event has it been guilty of abandonment under this section because, as it says, the abandonment contemplated by this section is a voluntary abandonment, accompanied by an intention permanently to give up the operation of its line. It is my opinion that the abandonment in this case was voluntary as I will hereinafter point out; even if it were not, I think the statute would have some application.

In the previous case involving the labor troubles of the defendant Railroad in which an injunction was sought by it against the Brotherhood of Railroad Trainmen, the Seventh Circuit Court of Appeals, in discussing the jurisdiction of this Court to enter the injunction, had this to say (Toledo, P. & W. R. R. v. Brotherhood of Railroad Trainmen Enterprise Lodge No. 27, 7 Cir., 132 F.2d 265 at Page 269):

"In the instant case, the acts complained of were so violent that plaintiff (T. P. & W. R. R.) was forced to abandon temporarily its train service. Yet Section 1(18) and Section 1(20) specifically prohibit abandonment of operations."

This seems to me to be a clear holding that the abandonment forced upon the T. P. & W. Railroad in that case was such an abandonment as is contemplated by the statute above quoted.

In this case I believe that the abandonment of service on the defendant's railroad can well be characterized as voluntary.

The cessation of service on defendant's railroad on October 1, 1945, was the direct and proximate result of the railroad's failure to meet with representatives of defendant brotherhoods in the month of September 1945. While the brotherhoods can be convicted of failure to pursue collective bargaining to its fullest extent through their failure to request additional steps for negotiation the latter part of the month, nevertheless taking into consideration the history of the labor relations prevailing between the parties for the past five years and in view of the obstinate, unreasonable and provocative policy followed by the railroad in its labor relations, the management of the railroad knew or should have known that its acts in September 1945 could have no result other than that of causing a strike. The railroad's action in issuing an embargo the latter part of September shows clearly that it knew such a strike would occur and that such a strike would keep it from handling freight in a proper manner. On the other hand, the brotherhood's failure to engage in collective bargaining and attempt to settle their dispute with the railroad has clearly contributed to the abandonment of operations. In my view both the defendant brotherhoods and the defendant railroad have caused the violation of the railroad's common law and statutory obligations to provide adequate transportation to the general public.

■ That being the case, there remains for consideration the question as to what action the Court should take to see that the public's right of adequate transportation on the defendant railroad is fulfilled and that the railroad's corresponding duty is carried out. In the light of circumstances of this case, I can see no feasible remedy other than the appointment of a receiver.

The defendant railroad has argued strenuously that such relief should not be granted because it says no other relief is sought by the complaint and a receiver should not be appointed where that is the

ultimate relief. An examination of the authorities shows, however, that this is a rule of decision and that whenever the case is "exceptional" and there appears to be no other adequate remedy, the rule is disregarded or not mentioned. Indeed, I find many federal cases where receivership appears to have been the only relief sought and where a receiver was appointed.

See Sage v. Memphis & L. R.R. Co., 125 U.S. 361, 8 S.Ct. 887, 31 L.Ed. 694; New England R. Co. v. Carnegie Steel Co. Ltd., 1 Cir., 75 F. 54; Brassey v. New York & N. E. R. Co., C.C.Conn., 19 F. 663; see also Hackler v. Farm & Home Savings & Loan Association, D.C., 6 F. Supp. 610. Further, this appears to be an "exceptional" case in every sense of the word.

Receivers are appointed for ordinary business corporations where the corporate affairs are deadlocked because of disagreements among stockholders (Saltz v. Saltz Bros., 65 App.D.C. 393, 84 F.2d 246); where the directors or majority stockholders are guilty of fraud or gross mismanagement (Burnrite Coal Briquette Co. v. Riggs, 274 U.S. 208, 47 S.Ct. 578, 71 L.Ed. 1002); where the necessary officers or directors are not acting (In re Cleveland Discount Co., D.C., 5 F.2d 846); or where the corporate purposes can no longer be attained (Hall v. City Park Brewing Co., 294 Pa. 127, 143 A. 582). See also Tower Hill-Connellsville Coke Co. v. Piedmont Coal Co., 4 Cir., 64 F.2d 817, 91 A.L.R. 648, where many similar authorities are collected.

These cases show the extent to which equity has gone in protecting the property rights of stockholders and creditors. Here, where I am dealing with a railroad corporation, I must give primary consideration to the public interest. That interest, in my opinion, has suffered and is suffering irreparable injury because of the deadlock between labor and management prevailing on the defendant railroad. The difference between this situation and that prevailing in the case of an ordinary business corporation is well stated in Cowan v. Pennsylvania Plate-Glass Co., 184 Pa. 1, 38 A. 1075 at page 1077, where the Court says:

"This was a private manufacturing corporation, owing no special duty to the public, and the latter had no direct interest in the continuance of its operations. Creditors and stockholders alone had a direct special interest in the property. The facts which would move a court of equity to place a railroad or other common carrier corporation in the hands of a receiver might not avail to prompt the same decree as against a manufacturing corporation. In the first case the court must consider the interests of the public, as well as those of creditors and stockholders. Any act on the part of the corporate officers which would interrupt or suspend the regular, continued operations of the corporation, in its public capacity, whereby serious inconvenience and loss would result to the public, might be sufficient to move the court to appoint a receiver, and this even where no complaint is made by stockholders or creditors; for its franchises and privileges were conferred on it by the public on the condition, express or implied, that it would exercise its functions for the benefit of the public as well as for the benefit of stockholders."

I have no doubt of the power of a court of equity to appoint a receiver in this case. In Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co., C.C.Ohio, 54 F. 746, 19 L.R.A. 395, in discussing certain injunction orders issued by the court to compel the interchange of cars between a strike-bound railroad and connecting carriers, the court said (page 751):

"It is said the orders issued in this case are without precedent. Every just order or rule known to equity courts was born of some emergency, to meet some new conditions, and was, therefore, in its time, without a precedent. If based on sound principles, and beneficent results follow their enforcement, affording necessary relief to the one party without imposing illegal burdens on the other, new remedies and unprecedented orders are not unwelcome aids to the chancellor to meet the constantly varying demands for equitable relief. Mr. Justice Brewer, sitting in the circuit court for Nebraska, said:

"'I believe most thoroughly that the powers of a court of equity are as vast,

and its processes and procedure as elastic, as all the changing emergencies of increasingly complex business relations and the protection of rights can demand.' "

Mr. Justice Blatchford, speaking for the supreme court in Joy v. St. Louis, 138 U.S. 1, 11 S.Ct. 243, 258, 34 L.Ed. 843, said:

"It is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation."

The spirit of these decisions has controlled this court in its action in this case.

■ The jurisdiction of equity to appoint receivers is based on the necessity of taking the step in order to do full and adequate justice to the parties. McDougal v. Huntingdon & Broad Top Mt. R. & C. Co., 294 Pa. 108, 143 A. 574, 577. This same case discusses the rights of the public in matters of this kind at page 580 of 143 A. See also Thoroughgood v. Georgetown Water Co., 9 Del.Ch. 84, 77 A. 720.

A situation somewhat similar to this faced the court in McCran v. Public Service Ry. Co., 95 N.J.Eq. 22, 122 A. 205. There a street railway company ceased operations because of a labor dispute and the action was brought to compel resumption of service. The company insisted it could not operate except at a loss and claimed that therefore a mandatory injunction should not issue. Overruling this contention, the court held that a public utility which had not surrendered its franchise, was legally obligated to operate even though such operation was unprofitable. I cite this case mainly to the point that a railroad is under an absolute duty to operate,[1] but it should also be noted that the court further said, at p. 209;

"If the injunction were not obeyed, then it appears the informant would be entitled to the appointment of a receiver, under the general equity powers of the court, to carry out its mandate by operating the road."

I recognize that receivership is to be used sparingly and that it is a drastic remedy. The defendant railroad urges in a counterclaim that I should grant it protection by injunction against the unions and states that it can then operate. But I am barred in any event from granting such relief by the decision in Brotherhood of Railroad Trainmen, etc., v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. Further, I do not believe such relief would adequately restore service to the shippers. The same would be true were I to issue a mandatory injunction to the T. P. & W. R. R. Recently enacted labor statutes and recent decisions would largely protect the employees[2] and it would be difficult, if not impossible, for the T. P. & W. to effect interchange of cars with connecting carriers, most of whose employees are Brotherhood members. Under these circumstances I see no alternative to the appointment of a receiver. It is claimed that if the railroad company cannot operate its line, neither can the court's receiver operate it. My answer to that is that if a Federal Manager can operate the railroad, as was done in this case from 1942 to 1945, a court receiver can do it.

■ The defendant railroad has argued vigorously that this proceeding is an indirect means of settling a labor dispute and that this is not a proper or legal function of a Federal court of equity. This contention of the railroad is not correct. The relief sought in this suit is by the plaintiff shippers and the general public who have no interest in any labor dispute, but who are being seriously injured by the cessation of transportation on the defendant railroad. The Federal courts have held that in railroad cases the rights of the public are paramount and superior to the rights of the railroad or the employees.

---

[1] That the duty is absolute, see also: Illinois Central R. Co. v. Int. Ass'n of Mach., C.C.Ill., 190 F. 910; People v. New York C. & H. R. R. Co., 28 Hun (N.Y.) 543.

[2] Allen Bradley Co. v. Local Union No.

3, 325 U.S. 797, 65 S.Ct. 1533, 89 L. Ed. 1939; United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Lee Way Motor Freight, Inc., et al. v. Keystone Freight Lines, Inc., 10 Cir., 126 F.2d 931.

Chicago B. & Q. R. R. Co. v. Burlington Ry. Co., C.C.Iowa, 34 F. 481.

The judgment rendered by the Court in this case seeks to give relief to these plaintiffs and to an intolerable situation foisted upon them by reason of a labor dispute between the employer railroad and the employee brotherhoods. For over five years this labor dispute has been continuing and will continue, in my opinion, indefinitely unless some agency of government gives relief to the public. The defendant railroad, the record shows, helped create this dispute. In 1941–1942 it refused to proceed to arbitration under the terms of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. This was so determined by the Supreme Court in Trainmen v. T. P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534, wherein it was held that the defendant railroad was not entitled to an injunction because of such refusal. It again refused to meet with the defendant brotherhoods in September of 1945, just prior to the end of the Federal seizure of the railroad. It has failed to comply with the Federal statutes relating to the settlement of labor disputes. The brotherhoods have not always been willing to proceed in a cooperative manner and have been on strike and have had a great deal to do with the failure of this railroad to operate. In the meantime, the public have suffered intolerably and this Court, in its judgment, without any effort to settle a labor dispute, seeks as a court of equity to give relief to the public. After all, this is a public utility whose first purpose is to serve the public and neither the employer nor the employees can be permitted to thwart the public interest.

█ It may also be urged that if the granting of relief here is sought to be based in part on "abandonment" under Section 1(18) of the Interstate Commerce Act, the only available remedy is an injunction directed to the carrier to prevent abandonment as provided in Sec. 1(20) of the same act. The language of the latter section is permissive, however, and in my opinion does not forestall the granting of other relief.

Section 36 of the Investment Company Act of 1940, 15 U.S.C.A. § 80a—35, authorizes the S.E.C. to bring action against officers, directors, etc., of investment companies for "gross abuse of trust." It further provides that if such abuse is proven " * * * the court shall enjoin such person from acting in such capacity * * *." There is no provision for other forms of relief. In Aldred Inv. Trust v. Securities and Exchange Commission, 1 Cir., 151 F.2d 254 (certiorari denied 66 S.Ct. 486), the S.E.C. brought suit to enjoin the officers and trustees of defendant trust from continuing to act and for the appointment of a receiver, alleging as grounds a "gross abuse of trust" under Sec. 36. Full relief was granted including the appointment of a receiver, and defendants appealed claiming, in part, the S.E.C. was not authorized under the statute to ask for a receiver. In rejecting this contention, the Circuit court said (page 261 of 151 F.2d):

"In granting relief the District Court relied upon its equity power to appoint receivers with power either to reorganize or liquidate the Trust. In the light of the circumstances surrounding this case the only effective means of protecting the interests of the debenture holders was to remove Hanlon from the control of the trust assets which do not belong to him. Section 36 invokes the equity power of the Federal Court and that calls into play its inherent powers where necessary to do justice and grant full relief. The appointment of receivers in the case at bar was an appropriate exercise of the court's inherent equity power".

This doctrine has the approval of the Supreme Court and is, I believe, a complete answer to the objection I have stated.

█ There is one further point to be mentioned. In considering the appointment of a receiver, the court should balance the benefits to be obtained against the injury to the corporation and its owners and will not appoint a receiver where the injury out-weighs the good. McDougal v. Huntingdon & Broad Top Mt. R. & C. Co., supra. In this case I believe the good to be accomplished far outweighs any possible injury to defendant railroad. Since October 1, 1945, its roadbed and rolling stock (except for one locomotive and a few cars) have been lying idle and, in my

opinion, deteriorating faster than it would if in use. Further the road has had practically no revenue during that period and obviously will be better off from that standpoint if a receiver runs it. The large profits made by the Federal Manager during the war period are some indication of the financial losses being suffered by the railroad as a result of non-operation. In my opinion, therefore, all parties, including the railroad, will be better off with a receiver than without one and this further strengthens my view that a receiver is necessary. I have no doubt that if a creditor or stockholder of the T. P. & W. R. R. were seeking the relief, it would be granted. It should more readily be granted on behalf of the public whose rights are paramount.